### In re SOUTHERN OHIO CORRECTIONAL FACILITY.

No. C–1–93–436.

United States District Court, S.D. Ohio, Western Division.

April 22, 1997.

---

208

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on the parties' "Joint Motion to Approve Class Action Resolution," (doc. 269), and Plaintiffs' Memorandum in Support of Class Action Settlement (doc. 323) Also before the Court is Plaintiffs' Motion for Attorneys' Fees and Expenses (doc. 285). Defendants objected to the inclusion of a request for incentive awards in Plaintiffs' Motion for Attorneys' Fees and Expenses (doc. 314).

## BACKGROUND

This is a prisoner civil rights class action relating to the April 1993 riot at the Southern Ohio Correctional Facility ("SOCF"), a maximum security prison in Lucasville, Ohio. Plaintiffs challenge the conditions of confinement at SOCF following the riot and seek damages based on Defendants' alleged failure to protect the inmate class members from death, injury, and property loss during the riot.

Following the riot, more than forty (40) inmates filed *pro se* cases based upon the SOCF riot and subsequent lockdown. (doc. 285, Gerhardstein Aff. at ¶ 2). On December 2, 1994, the Court certified this case as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure and subsequently consolidated all the individual lawsuits with the class action case. (doc. 65). The action was brought by, and on behalf of, those inmates present at SOCF on or since the riot who did not commit, and thus were not sub-

ject to criminal prosecution for, any illegal acts during the riot.

The named Plaintiffs in this action are Darrin Morris and Eugene Adams, who were at SOCF during the riot and have remained in the custody of Ohio prisons during this lawsuit. The named Defendants are George Voinovich, Governor of the State of Ohio, Reginald Wilkinson, Director of the Ohio Department of Rehabilitation and Correction ("ODRC"), Arthur Tate, Jr., former warden of SOCF, Terry Collins, present warden of SOCF, and twenty-three other persons employed by ODRC.[1]

The members of the class are:

All inmates, living and deceased, who meet all of the following criteria: (1) the inmate has been incarcerated at the Southern Ohio Correctional Facility (SOCF) on or since April 11, 1993; (2) the inmate has been classified as a general population inmate during some or all of that time period.

*Id.* The class includes two subclasses: (1) those inmates present in K–8 block on or about April 13, 1993, and (2) those inmates indicted for crimes based on the riot. The class includes the nine (9) inmates who were murdered during the riot, the approximately 670 inmates in L and K blocks during the riot, and the thousands of general population inmates who have been incarcerated at SOCF since April 11, 1993. (doc. 323).

Plaintiffs state four damage claims against Defendants. They allege that (1) Defendants failed to protect the class members from the April 11, 1993, prison riot; (2) Defendants failed to protect the class members from violence in the K–2 block during the riot; (3) Defendants denied housing necessities, used excessive force and destroyed the property of those inmates locked in K–8 during the riot; and (4) Defendants imposed a retaliatory lockdown on the inmates of the institution for more than a year after the riot. (doc. 187). Plaintiffs claim these actions violated their right to be free from cruel and unusual pun-

1. Plaintiffs named the twenty-three new Defendants in their Amended and Second Amended Complaints in May and July of 1996 (docs. 139 & 187). The Court affirmed the Magistrate Judge's Report and Recommendation granting the motion to amend the Complaint in October 1996 (doc. 212).

ishment under the Eighth Amendment to the United States Constitution, violated their rights under the First and Fourteenth Amendments to the United States Constitution, and violated their rights under the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–2000bb4. *Id.*

## I. HISTORY OF THE LITIGATION

On December 17, 1993, the United States Magistrate Judge asked the following law firms and individual attorneys to act as counsel for Plaintiffs: Dinsmore & Shohl; Alphonse A. Gerhardstein; Sirkin, Pinales, Mezibov & Schwartz, and Waite, Schneider, Bayless & Chesley.[2] (doc. 20). They agreed to explore the possibility of a class action litigation in the matter involving the SOCF riot. *Id.* Almost a year later, in the same Order which certified the case as a class action, the Magistrate Judge appointed the above counsel, law firms and individual attorneys to be Class Counsel. (doc. 65).

Class Counsel devised a case plan which prioritized the work to be done. After the initial investigation, Class Counsel drafted the class action Complaint and determined the class members. (doc. 285; Gerhardstein Aff. at ¶ 3). Then Class Counsel worked on ending the lockdown of general population inmates, ending the lockdown of inmates held in security control investigation, discovery on the damage claims, and trial on the damage claims. *Id.* The work involved in achieving each of these goals is detailed below.

### A. ENDING THE POST–RIOT LOCKDOWN OF GENERAL POPULATION INMATES

In the Spring of 1994, almost a year after the riot, Class Counsel, along with their hired expert Steve Martin, negotiated with Defendants to lift the lockdown of the general population inmates at SOCF. *Id.* at ¶ 12. Between April 15, 1994, and the Summer of 1994, Class Counsel and Mr. Martin negotiated the resolution of the inmate visitation issue and the reopening of the yard, chapel

and law library. *Id.* at ¶¶ 12, 13. Further, at the urging of Class Counsel and Mr. Martin, Defendants accepted the proposal that the Max III and Max IV classifications be abolished, and Defendants undertook a review of the security classification system. *Id.* at ¶ 13.

### B. ENDING LOCKDOWN OF INMATES HELD IN SECURITY CONTROL

After the riot, approximately 150 inmates were "detained on lockdown status (security control) at SOCF and Mansfield Correctional Facility as suspects in the criminal investigation of the riot." *Id.* at ¶ 15. On August 18, 1994, the special prosecutor of those inmates who had been indicted for riot-related crimes informed Class Counsel which of the inmates held in security control were indicted, "cleared," or recommended for administrative charges. *Id.* at ¶ 16. Immediately thereafter, Class Counsel pursued the release from lockdown of those inmates not indicted. Id. Class Counsel filed a preliminary injunction motion on January 23, 1995, to accomplish this result. *Id.*

Class Counsel also negotiated with Defendants for a special Rules Infraction Board ("RIB") procedure to handle the cases of inmates against whom administrative charges for riot-related, violent misconduct were filed. *Id.* at ¶ 17. This special procedure included a provision for an inmate advocate and an outside screening panel. *Id.* at ¶ 18.

On February 16, 1995, the Parties agreed that the Plaintiff Class would withdraw their motion for a preliminary injunction in exchange for the Defendants' agreement to commence the processing of each rule infraction by those inmates subject to the motion using the administrative procedures negotiated by the Parties and set out in an exhibit to the agreed entry. (doc. 75).

A neutral observer of the process, attorney Vincent Nathan who is an expert in prison

---

**2.** The principle attorneys who represented Plaintiffs include: Alphonse A. Gerhardstein; Stanley Chesley, Fay Stilz, and Paul DeMarco, of Waite, Schneider, Bayless & Chesley; Marc D. Mezibov

of Sirkin, Pinales, Mezibov & Schwartz; Neal D. Baker of Dinsmore & Shohl; and Sylvia Paxton, staff counsel.

litigation, issued a report summarizing the RIB procedure. *Id.* at ¶ 19. He stated that "RIB panels and their chairmen have afforded the benefits of procedural due process and substantive due process to prisoners charged with offense that evoke strong emotional responses in DR & C staff. Outcomes, ..., not only have been procedurally correct, they have been fair." *Id.*

## C. DISCOVERY AND TRIAL PREPARATION FOR DAMAGE CLAIMS

Since the Spring of 1995, Class Counsel have concentrated their efforts on document production, depositions and review of the claims for damages based on Defendants' alleged failure to protect the members of the class. *Id.* at ¶ 21.

The Summary Jury Trial took place in the Summer § of 1996. Thereafter, the Parties engaged in extensive negotiations, some of which the Court facilitated, which took place over several months and involved Class Counsel as well as numerous attorneys for Defendants. *Id.* at ¶ 23.

Plaintiffs prepared for trial, the presentation of the issues and evidence to the Summary Jury, and the post-Summary Jury Trial negotiations. *Id.* at ¶¶ 22, 23. Plaintiffs were ready to proceed to trial on the merits at the time the case was resolved. *Id.*

On January 22, 1997, the Parties signed the Class Action Memorandum of Understanding ("MOU"), which memorialized the resolution of this case, and the Court preliminarily approved the Settlement on January 30, 1997. (docs. 269 & 273).

## II. SUMMARY OF THE PROPOSED SETTLEMENT

The resolution of this case is memorialized in the Parties' Memorandum of Understanding and the General Protocol for Claims by Class Members Against the Settlement Fund (hereinafter collectively referred to as the "Settlement"). (docs. 269 & 273). The Parties stipulated to the dismissal with prejudice of all claims and causes of action against all Defendants, and Plaintiffs agreed to release all Defendants from all claims in connection

with the SOCF riot. (doc. 269; MOU at ¶ 50–53).

The Settlement has two major components. First, it provides for an agreement on eleven (11) issues that serve to "maintain or improve the quality of inmate life." (doc. 285; Gerhardstein Aff. at ¶ 24). Second, the Settlement establishes a $4.1 million Fund, from which inmate damage claims, attorneys' fees and expenses will be paid. (doc. 269; MOU at ¶ 41).

The terms of the Settlement affecting the "quality of life" issues include: (1) single-celling maximum security inmates; (2) modifying the inmate classification system; (3) transferring lower security inmates out of SOCF; (4) upgrading programming at SOCF if the prison begins to serve lower security classification inmates; (5) addressing parole problems for inmates who were at SOCF during the riot; (6) piloting a program for hearing alleged rule violations; (7) ensuring mental health care for inmates present at SOCF during the riot; (8) improving racial and cultural relations; (9) securing at least forty (40) hours of out-of-cell time per week for SOCF inmates; (10) instituting new state-wide directives on religious practices; and (11) studying the institutional adjustment of inmates with long sentences. (doc. 285; Gerhardstein Aff. at ¶ 24); (doc. 269; MOU at ¶¶ 12–40).

The Settlement provides that a class member or an administrator or executor on behalf of a deceased class member's estate shall be permitted to receive compensation from the Fund only if the class member was (1) murdered during the riot; (2) physically injured during the riot; (3) lost property during or as a consequence of the riot; or (4) if the claim falls outside the first three categories, and the class member can demonstrate that he has "suffered any other serious riot-related injury and that the relief available under the Operational Provisions of this Memorandum are seriously inadequate for that class member given his personal situation and that the denial of compensation to him would impose an injustice." (doc. 269; MOU at ¶ 43). Further, the General Protocol establishes the procedure for the administration

and distribution of the Settlement Fund. (doc. 273).

### III. NOTICE OF THE PROPOSED SETTLEMENT

Notice of the proposed Settlement was accomplished pursuant to our Order of January 30, 1997. (doc. 273). In that Order, we approved the class notice to be sent to the class members. *Id.* Class Counsel mailed approximately 2,201 notices to the inmates who were present at SOCF at any time between April 11, 1993, and June 20, 1994. (doc. 279; Stilz Aff. at ¶¶ 1, 2; doc. 289; Hillman Aff. at ¶ 1). In addition, prior to the Fairness Hearing, Mr. Gerhardstein, visited class members incarcerated at seven correctional institutions across the state to inform them of the proposed Settlement. (doc. 285; Gerhardstein Aff. at ¶ 10). Further, Defendants have posted a copy of the notice in a conspicuous place in the cellblocks of all the Ohio adult male prisons, and have placed in every prison library copies of (1) the Order preliminarily approving the Settlement, (2) the class notice, (3) the MOU, (4) the resumes of the Claims Administrator/Trustee Mr. Barrett and assistant Mr. Benjamin, and (5) the General Protocol for Claims by Class Members against the Settlement Fund. (doc. 323, Ex. A–1).

### IV. FAIRNESS HEARING

The Court held a hearing to determine the fairness, reasonableness, and adequacy of the Settlement on April 15, 1997. No objections were voiced at the hearing.[3] Twenty-five (25) notices of objections were filed with the Court before the hearing, which the Court will consider below. (doc. 323, Ex. A–2).

### DISCUSSION

### I. JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

The first issue before the Court is to decide whether the Settlement is fair, reasonable, and adequate.

---

**3.** Counsel for four of the estates of the decedent class members spoke briefly in support of the

### A. LEGAL STANDARD

■ According to Rule 23 of the Federal Rules of Civil Procedure, court approval is required to settle a class action. Fed. R.Civ.P. 23(e).

A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs.

*Id.* The law generally favors the settlement of complex class actions. *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240, 246 (S.D.Ohio 1991); *see also* 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions,* § 11.41 (3d ed.1992).

■ There are three steps which must be taken by the court in order to approve a settlement: (1) the court must preliminarily approve the proposed settlement, (2) members of the class must be given notice of the proposed settlement, and (3) after holding a hearing, the court must give its final approval of the settlement based on a finding that the settlement is fair, reasonable and adequate. *Williams v. Vukovich,* 720 F.2d 909, 921 (6th Cir.1983); *Enterprise Energy Corp.,* 137 F.R.D. at 245; *In re Dun & Bradstreet Credit Services Customer Litigation,* 130 F.R.D. 366, 369 (S.D.Ohio 1990).

■ The district court bases its preliminary approval of a proposed settlement upon its familiarity with the issues and evidence of the case as well as the arms-length nature of the negotiations prior to the settlement. *In re Dun,* 130 F.R.D. at 369. The court should also determine that the settlement is neither illegal nor collusive. *Vukovich,* 720 F.2d at 921; *In re Dun,* 130 F.R.D. at 369. With such preliminary approval, the settlement is presumptively reasonable, and an individual who objects has a heavy burden of proving the settlement is unreasonable. *Vukovich,* 720 F.2d at 921 (citing *Stotts v. Memphis Fire Dep't,* 679 F.2d 541, 551, (6th Cir.1982), *rev. on other grounds,* 467 U.S. 561, 104 S.Ct.

---

Settlement.

2576, 81 L.Ed.2d 483 (1984)); *Enterprise Energy Corp.*, 137 F.R.D. at 246.

■ Notice of the proposed settlement should be given to all those affected by it. *Vukovich,* 720 F.2d at 921; *In re Dun,* 130 F.R.D. at 370. All parties should be given the opportunity to consider the settlement and respond to it. *Id.*

■ The district court may give its final approval of a class action settlement if it determines that the settlement is "fair, adequate, and reasonable, as well as consistent with the public interest." *Bailey v. Great Lakes Canning, Inc.,* 908 F.2d 38, 42 (6th Cir.1990); *see also Vukovich,* 720 F.2d at 921; *Enterprise Energy Corp.,* 137 F.R.D. at 245; *In re Dun,* 130 F.R.D. at 369. This is determined by examining the settlement "in its entirety and not as isolated components." *Enterprise Energy Corp.,* 137 F.R.D. at 245. The court is not "to determine the merits of the controversy or the factual underpinning of the legal authorities advanced by the parties." *Vukovich,* 720 F.2d at 921.

■ There are several factors considered in deciding whether to approve the settlement: (1) the plaintiffs' likelihood of ultimate success on the merits balanced against the amount and form of relief offered in the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the judgment of experienced trial counsel; (5) the nature of the negotiations; (6) the objections raised by the class members; and (7) the public interest. *In re Dun,* 130 F.R.D. at 371 (citing *Vukovich,* 720 F.2d at 922); *Enterprise Energy Corp.,* 137 F.R.D. at 245; *Thompson v. Midwest Foundation Independent Physicians Association,* 124 F.R.D. 154, 157 (S.D.Ohio 1988).

## B. FINDINGS AND CONCLUSIONS CONCERNING THE SETTLEMENT

The Court preliminarily approved the Settlement on January 30, 1997, based upon its familiarity with the problems and issues in the case as well as the character of the Settlement negotiations. (doc. 273). The Court facilitated and supervised Settlement negotiations between the Parties during the Fall of 1996, some of which were attended personally by the Ohio Attorney General, Betty Montgomery, and the Director of the ODRC, Reginald Wilkinson. The Court agrees with the Parties' representation that the negotiations were hotly contested, conducted at arms-length, involved difficult issues, and resulted in a Settlement that is neither illegal nor collusive.

Notice of the proposed Settlement and the Fairness Hearing were completed in compliance with Rule 23, and the Court finds that the notice provided the class members a full and fair opportunity to consider the proposed Settlement and to respond to it.

This Judge volunteered to obtain another judge to conduct the Fairness Hearing. However, all counsel requested that this Judge remain in the case. *See* Honorable S. Arthur Spiegel, *Settling Class Actions,* 62 U. Cin. L.Rev. 1565 (1994).

■ After considering the relevant factors discussed below, the Court concludes that the proposed Settlement agreement is fair, reasonable and adequate.

1. *Plaintiffs' Likelihood Of Ultimate Success On The Merits Balanced Against The Amount And Form Of Relief Offered In The Settlement*

The Settlement provides the class members significant economic and non-economic benefits. It sets forth comprehensive relief with respect to the inmate "quality of life" issues as well establishes a substantial monetary fund for the class members. Comparing this relief to that which could be achieved through continued litigation weighs in favor of approval of the Settlement.

The current state of the law regarding prison conditions and inmate rights would make it difficult to achieve the same results provided by the Settlement through continued litigation. For example, the United States Supreme Court has held that double-celling inmates at SOCF is not a violation of the Eighth Amendment, *see Rhodes v. Chapman,* 452 U.S. 337, 348–49, 101 S.Ct. 2392, 2400–01, 69 L.Ed.2d 59 (1981), but signifi-

cantly, the Settlement calls for single-celling at SOCF.

■ Also, there is no constitutional right to a particular security classification or to be incarcerated at a particular institution. *See Sandin v. Conner*, 515 U.S. 472, 483–84, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995); *Beard v. Livesay*, 798 F.2d 874, 876 (6th Cir.1986). Yet, the Settlement gives inmates access to their security rating instruments and the decisions underlying those classifications, which allows the inmates to know how to improve their security rating. Then, once they achieve a reduction in their security rating, pursuant to the Settlement, they are entitled to be transferred out of SOCF to an institution of an appropriate security level.

■ Also it would be difficult to achieve the terms dealing with conditions of confinement, such as the agreement for an average of 40 hours a week out-of cell-time for general population inmates at SOCF, and to prevail on the failure to protect claims, because in order to prove an Eighth Amendment violation regarding inmate conditions of confinement, the inmate must demonstrate "deliberate indifference" on the part of the prison officials. *See Wilson v. Seiter*, 501 U.S. 294, 303, 111 S.Ct. 2321, 2326–27, 115 L.Ed.2d 271 (1991).

Moreover, the Supreme Court has limited the Due Process rights of inmates facing lockdown status. *See Sandin v. Conner*, 515 U.S. 472, 483–84, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995) (the liberty interest "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."). Thus, for example, the special RIB program which became the basis of the RIB Pilot Project set out in the Settlement provides more relief than litigation would likely produce.

Moreover, the Settlement confers a greater monetary benefit upon more inmates than a trial would probably accomplish. According to Class Counsel, the $4.1 million repre-sents the largest settlement fund established through litigation following a prison riot. (doc. 285; Gerhardstein Aff. at ¶ 24); *cf. In re Jackson Lockdown*, 107 F.R.D. 703, 705 (E.D.Mich.1985) (awarding close to $200,000 for all damages, fees and expenses arising from riot and lockdown). The results of the Summary Jury Trial on the damage claims were a "mixed-bag" and indicated that Plaintiffs would have a formidable task of meeting the burden of proving, for example, deliberate indifference or excessive force, at trial.

Therefore, we are convinced that the Settlement provides an immediate benefit to the class members. These benefits, balanced against the potential costs and risks associated with continued litigation of this case, support a finding that the Settlement is fair, reasonable and adequate.

### 2. The Complexity, Expense, and Likely Duration Of The Litigation

This case presents very complex legal and factual issues. Despite the fact that the Parties have worked diligently and vigorously for the past four years, it is likely that the matter would not be concluded for many more years. At the time of the Settlement, Defendants sought a ruling on the issue of qualified immunity; there was a very real possibility of a pretrial appeal on that issue. Then, there would be a multi-week trial on liability for the bellwether damage Plaintiffs; then mini-trials of the other class members' claims would follow; and then there is still the possibility of more appeals. Given the delay which would result from the continued litigation, this Settlement expedites the awarding of the class members with economic and non-economic benefits.

### 3. The Stage Of The Proceedings And The Amount Of Discovery Completed

At the time of the Settlement, the Parties had completed discovery and prepared the case for trial. As a result of the Summary Jury Trial and their vigorous preparation, the Parties are aware of the strengths and weaknesses of their respective positions. Thus, the Settlement is achieved as a result of the Parties' thorough investigation and

analysis of the facts and legal issues implicated in this case.

### 4. *The Judgment Of Experienced Trial Counsel*

The Court appointed Class Counsel in December of 1993. The group of litigators comprising the Class Counsel team are extremely well-qualified and experienced in prisoner civil rights litigation and complex class action litigation. Clearly, Class Counsel's recommendation to approve the Settlement is well-informed. The Court heeds the recommendation of such experienced counsel.

### 5. *The Nature Of The Negotiations*

The Settlement was reached as a result of hard-fought and intense, arms-length negotiations, some of which the Court supervised. The negotiations did not reflect or suggest any collusion or illegality.

### 6. *The Objections Raised By The Class Members*

Of the approximately three thousand class members, only twenty-five filed written objections to the Settlement. (doc. 323, Ex.A–2). At least 17 of the class members were represented by counsel independent of Class Counsel; none of them filed an objection. (doc. 323).

■■■ The fact that some class members object to the Settlement does not by itself prevent the court from approving the agreement. *Enterprise Energy Corp.,* 137 F.R.D. at 246 (citing *Thompson,* 124 F.R.D. at 159). In considering the extent and significance of the objections, "the Court must view the agreement in its entirety, rather than isolating individual components of the agreement for analysis." *Bronson v. Bd. of Educ. of City School Dist. of City of Cincinnati,* 604 F.Supp. 68, 78 (S.D.Ohio 1984) (quoting *Liddell v. Bd. of Educ. of City of St. Louis,* 567 F.Supp. 1037 (E.D.Mo.1983)). Also, a relatively small number of class members who object is an indication of a settlement's fairness. *Newberg on Class Actions, supra,* at § 11.48.

The Court has carefully reviewed all the objections noted below. Viewing the Settlement in its entirety, we find that the Settlement is fair, reasonable and adequate.

The objections fall into four basic categories: (1) objections to monetary terms, (2) objections to quality of life terms, (3) objections to the representation by Class Counsel and Class Representatives, and (4) objections regarding the Ohio Attorney General's efforts to divert the money damages away from the inmates in the class to their creditors.

#### a. *Monetary Objections*

Some objectors contend that the amount of money is inadequate. We find that the amount is fair and adequate in light of the defenses raised, the amount of non-economic relief awarded, and the possibility that a sum considerably less could be awarded at trial.

Other class member object to the inclusion of the estates of the murdered inmates with the other damage claims. The discretion left to the Claims Administrator will ensure there is sufficient money for payment of other damage claims after the deceased inmate claims' are satisfied.

Some class members object because they fear that inmates who committed misconduct during the riot might be compensated. The Settlement provides for this situation: those convicted of the misconduct cannot be compensated, and if the inmate was administratively charged for riot-related misconduct, the misconduct can be factored in to the claim decision process.

Other class members are upset that their claims, such as for emotional distress or related to their being trapped in K–8 or K–2, will go uncompensated. Again, the Claims Administrator can best determine whether those claims and the inmates' individual circumstances meet the criteria established by the MOU.

Finally, some objectors are concerned about the amount of attorneys' fees and expenses. In light of the fact that a reasonable amount will be determined by the Court, we do not think that this is a basis for rejecting the Settlement.

### b. Quality of Life Objections

The class members who object to the quality of life terms essentially contend that the terms do not provide enough relief. As addressed earlier in this Order, we believe that the non-economic relief afforded to the class members is more than what could be achieved through litigation and is therefore more than adequate. The Parties' agreement to use best efforts to effectuate the Settlement sufficiently addresses other inmates' concerns that Defendants will ignore the quality of life terms. (doc. 269; MOU at ¶ 54).

### c. Representation Objections

Some class members object to the representation by Class Counsel and the Class Representatives. As these issues were already decided pursuant to Court Order prior to the Settlement, the objections are not timely and are not a basis for disturbing the Settlement.

### d. Objections Regarding the Ohio Attorney General's Efforts

Finally, some class members, as well as Class Counsel, are concerned about the Ohio Attorney General's efforts to take the money damages away from the inmates in the class. We find that this objection relates to the enforcement of the Settlement and administration of the Settlement Fund. We will address this concern at a later time and do not believe it is a sufficient basis for rejecting the Settlement.

### 7. The Public Interest

The public is certainly served by the resolution of this matter. The SOCF riot, the third-deadliest prison riot in recent United States history, during which nine inmates and one guard were slain, is indeed a tragic and unfortunate incident in Ohio prison history. (Fairness Hearing Pl.'s Ex. 8; *Prison Business: Does Riot's Price Cover Lessons Learned?, The Columbus Dispatch,* April 10, 1997, at 14A). The public has an interest in

seeing that the causes of the riot are addressed so that this tragedy will not be repeated. The Settlement addresses some of the issues related to the administration of the Ohio prison system that may have contributed to the SOCF riot. Moreover, the Settlement ends the contentious riot-related battle between prison officials and the inmates at SOCF. This will, in turn, help alleviate the tension at SOCF and thereby minimize the possibility of future disturbances. The public also benefits because the cost and time consumed by protracted litigation outweigh the costs associated with settling now and moving forward.[4]

Finally, we note that Defendants have objected to Plaintiffs' inclusion in Class Counsel's fee and expense application of a request for incentive awards to be given to the named Plaintiffs. Defendants made it clear at the Fairness Hearing that they object to the compensation of inmates beyond that which the Settlement provides for in paragraph 43 of the MOU.

This Court strongly believes that the issue of incentive awards should not be "the tail that wags the dog" in this Settlement. The Settlement is in the best interests of the people of Ohio, the state government, and the inmates involved. Whether the class representatives ultimately receive compensation for their valuable assistance to Class Counsel in prosecuting this case should not and will not jeopardize the consummation of this Settlement. The incentive awards are an administrative detail concerning the enforcement of the Settlement. As is further discussed below, the Court will take the matter under advisement after the Parties submit further briefing, and we will decide the issue at the appropriate time.

Based upon the foregoing, we find the Settlement to be fair, reasonable and adequate in all respects, and we APPROVE the Settlement. Accordingly, we GRANT the Joint Motion by the Parties for Order Approving Class Action Resolution.

---

4. Compare, for example, the litigation surrounding the 1971 Attica prison uprising in New York. According to Defendants' Counsel, the first liability trial occurred in 1992 and took 71 days to complete, costing the state $5 million in fees. And, although twenty-six (26) years later, there are still two more liability trials which have yet to occur.

## II. MOTION FOR ATTORNEYS' FEES AND EXPENSES TO CLASS COUNSEL

The second issue before the Court is whether to approve Class Counsel's application for attorneys' fees and expenses. The Settlement provides that, "[s]ubject to the approval of the Court after the submission of an application(s) for payment of attorneys fees and expenses by Class Counsel, attorneys fees and expenses shall be paid to Class Counsel ..." and that such fees and expenses shall be paid from the Settlement Fund. (doc. 269; MOU at ¶¶ 47 & 48). Further, Defendants agreed not to oppose Class Counsel's fee and expense application.[5] *Id.* at ¶ 49.

The resolution of this case resulted in a fund, comprised of $4.1 million, for the common benefit of the settlement class. Class Counsel are not seeking a fee award pursuant to 42 U.S.C. § 1988, which authorizes the court to grant a fee award to a prevailing party in an action to enforce a provision of 42 U.S.C. § 1983. They have, in essence, waived their right to seek attorneys' fees pursuant to § 1988 by settling all Plaintiffs' claims with Defendants.

■■■ Rather, the source of the fee award more closely resembles the award of fees in "common fund" cases.[6] The "common fund doctrine" provides that "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). It is premised upon the principle "that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense." *Id.* Thus, the issue before the Court is to decide the amount of the reasonable fee to which Class Counsel are entitled.

## A. FEE AWARDS IN A COMMON FUND CASE

■■■ Determining an award of attorneys' fees in a common fund case requires that the court consider factors which are not present in statutory fee shifting cases, such as under § 1988.[7] *Rawlings v. Prudential–Bache Properties, Inc.,* 9 F.3d 513, 516 (6th Cir. 1993). The Sixth Circuit explained why this is so:

> The interest of class counsel in obtaining fees is adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class. In addition there is often no one to argue for the interests of the class (that their recovery should not be unfairly reduced), since it is to be expected that class members with small individual stakes in the outcome will not file objections, and the defendant who contributed to the fund will usually have scant interest in how the fund is divided between the plaintiffs and class counsel.

*Id.*

In order to deal with these concerns, some courts have adopted the percentage of the fund method in such common fund case, and others have recognized that under some circumstances the lodestar method is appropriate. *Id.* at 515–16 (citations omitted). The lodestar method involves a calculation of "the

---

5. Defendants, however, have objected to the inclusion of a request for incentive awards for the two named Plaintiffs as an expense listed in their application for attorneys' fees and expenses.

6. The "common fund" doctrine often comes into play where there has not been a previous agreement that the attorneys' fees will come from the common settlement fund. *See e.g., Enterprise Energy Corp.,* 137 F.R.D. at 248; *In re Dun,* 130 F.R.D. at 372. The slight difference in this case is that the Parties already agreed that Class Counsel are entitled to a fee award coming from the "common fund." Because the interests of the class members with respect to the amount of the attorneys' fees are the same here as in these other common fund cases, we analyze the fee award here under that doctrine.

7. Section § 1988 provides that "the court, in its discretion, may allow the prevailing party, ..., a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). Section 1988 utilizes the "lodestar" method in arriving at a reasonable fee; a reasonable fee is calculated by multiplying the number of hours reasonably worked by a reasonable hourly rate. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).

number of hours worked, multiplied by a certain hourly rate, and typically further multiplied by a 'multiplier' to account for the cost and risk inherent in advancing fees, the complexity of the case, and the size of the recovery." *Newberg on Class Actions, supra*, at § 12.55; *see also Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The preferred method in common fund cases has been to award a reasonable percentage of the fund. *Bowling v. Pfizer*, 922 F.Supp. 1261, 1278–79 (S.D.Ohio 1996), *aff'd*, 102 F.3d 777 (6th Cir. 1996) (citations omitted) (citing a report by the Task Force appointed by the Third Circuit to evaluate the effectiveness of the lodestar method in making fee awards and summarizing the report's stated deficiencies of the lodestar method); *cf. Newberg on Class Actions, supra*, at § 12.55 (stating lodestar is the prevailing method of determining attorney's fees in common fund class actions over the past twenty years but also noting the recent criticism of the method). Typically, the percentage awarded ranges from 20 to 50 percent of the common fund created. *In re Cincinnati Gas & Electric Co. Securities Litigation*, 643 F.Supp. 148, 150 (S.D.Ohio 1986). Each method has its respective advantages and disadvantages. *See Bowling*, 922 F.Supp. at 1278–79. "The lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved." *Rawlings*, 9 F.3d at 516.

■ All the Sixth Circuit requires is that the award of attorneys' fees in common fund cases must be reasonable under the circumstances. *Rawlings*, 9 F.3d at 516; *Smillie v. Park Chemical Co.*, 710 F.2d 271, 275 (6th Cir.1983). Thus, district courts have the discretion "to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them." *Rawlings*, 9 F.3d at 516 (affirming district court's use of the lodestar method); *cf. Bowling*, 102 F.3d 777, 780 (6th Cir.1996) (affirming district court's methodology which based the fee award on a percentage of the fund and then cross-checked the fee against class counsel's lodestar). At bottom, the court must ensure

that class counsel are fairly compensated for the amount of work done as well as the results achieved. *Rawlings*, 9 F.3d at 516. Moreover, the court must provide a concise, clear explanation of the reasoning for adopting a particular methodology and the factors considered at arriving at the fee. *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941; *Rawlings*, 9 F.3d. at 516.

■ The Court recognizes that it has a choice in which of the two methods it adopts to determine the reasonable fee award. For the following reasons, we deem it reasonable to use the lodestar method for determining the fee award here. This case did not settle early on in the proceedings but rather after four years of extensive work by Class Counsel. Although the case had not yet proceeded to trial at the time of settlement, Class Counsel's participation in the Summary Jury Trial required almost as much preparation as the actual trial would have. Also, the monetary benefit to the class is relatively low compared to the total benefits, both non-economic and economic, the class received. Class Counsel has already reasonably discounted the "lodestar" to account for any duplication of work by the numerous attorneys working on this case, which in turn conserves judicial resources in scrutinizing the application. Finally, in civil rights actions under § 1983, such as this one, the court usually utilizes the lodestar method for determining a fee award under § 1988.

## B. CALCULATING CLASS COUNSEL'S FEE AWARD

Class Counsel request an award of attorneys' fees in the amount of $1.4 million and an award of expenses in the amount of $308,-613.41. (doc. 285).

■ The Sixth Circuit has clearly delineated the factors relevant to an award of attorneys' fees from a common fund established for the benefit of a class. *Smillie*, 710 F.2d at 275; *see also Enterprise Energy Corp.*, 137 F.R.D. at 248–249. Those considerations include:

(1) the value of the benefit rendered to the class; (2) society's stake in rewarding the

attorneys who produce such benefits in order to maintain an incentive to others; (3) whether the services were undertaken on a contingent fee basis; (4) the value of the services on an hourly basis; (5) the complexity of the litigation; and (6) the professional skill and standing of all counsel.

*Enterprise Energy Corp.*, 137 F.R.D. at 248–249.

As we have already discussed in connection with approving the Settlement, Class Counsel have rendered a significant benefit to the members of the class. Indeed, the Settlement offers substantial benefits beyond the $4.1 million common fund. Class Counsel has obtained an agreement on eleven separate issues which serve to maintain or improve the quality of inmate life.

Defending the rights of inmates and keeping in check the state's use of control over the prison system are often unpopular positions to take. The Court suspects that the opinions of inmates typically hold little weight by those making decisions affecting their confinement, and there are few groups who advocate on behalf of the incarcerated. Thus, attorneys are to be encouraged to prosecute cases such as this one. Indeed, one of the purposes of § 1988 was to allow private individuals an opportunity to vindicate civil rights violations. *See e.g., Ortiz v. Regan*, 980 F.2d 138, 140 (2d Cir.1992). Moreover, Class Counsel were appointed to handle this litigation. They accepted this representation upon a fully contingent basis and should be adequately compensated for accepting that risk.

The value of the services rendered by Class Counsel, or the "lodestar figure," amounts to $1,734,572.70. Class Counsel have summarized the basic lodestar for each of the attorneys, paralegals and law clerks who have worked on this case. (doc. 285; Table # 1). Each of the attorneys for the class has attested to their qualifications and experience litigating civil rights and class action cases. (doc. 285). Also, each attorney has supported their requested hourly rate with a statement that the rate is based on examination of similar awards to comparable attorneys. *Id.* Billing judgment was exercised at the time the work was performed and entered onto the time sheets, so the time sheets do not reflect all the time expended for a particular service. *Id.* Class Counsel have reduced the basic lodestar by 20% to account for any duplication of work or any inefficiency due to the numerous attorneys who worked on this case. The discounted lodestar amounts to $1,400,000.00.

The Court has carefully reviewed the hourly rates and the total number of hours billed by Class Counsel and their law firms. We find that the hourly rates are reasonable given the expertise of Class Counsel in this type of litigation. Moreover, the 20% reduction is more than fair to account for duplication of effort or any inefficiency.

The time sheets submitted and the record in this case amply demonstrate that this litigation involved complex factual and legal issues, which were vigorously defended by all counsel.

We also note that the requested amount represents approximately 34% of the total amount of the common fund. Even if one analyzed the fee award in terms of a percentage of the common fund, the requested award of $1.4 million is still within the range of reasonableness, which has been designated as between twenty to fifty percent of the common fund. *See In re Cincinnati Gas & Electric Co. Securities Litigation*, 643 F.Supp. at 150.

Finally, although we have stated this earlier, it bears repeating: Class Counsel, Special Counsel for Defendants [8], and the office of the Ohio Attorney General have exercised the highest degree of skill, dedication, and professionalism in this matter. Indeed, both the class members as well as Defendants were well-served by the representation of their counsel.

The Court has reviewed all the submissions in connection with this fee application. The Court heard from both Class Counsel

---

8. Gerald Messerman, along with the Office of the Ohio Attorney General, represented Arthur Tate, Jr., Governor George Voinovich, Reginald Wilkinson, and Terry Collins. John Berry represented the twenty-three other Defendants.

and counsel for Defendants and afforded any objector to the fee application an opportunity to be heard at the hearing on April 15, 1997. In light of our consideration of the above factors, we find that the requested fee award of $1.4 million is reasonable and appropriate.

## C. EXPENSES

■ Class Counsel have also requested $308,613.41 in expenses. Of the total expenses requested, the amount earmarked for incentive awards for the named Plaintiffs equals $50,000. With the exception of the incentive awards, which will be dealt with at a later date, we find the expenses requested reasonable given the duration of the litigation.

Accordingly, we AWARD Class Counsel $1.4 million in attorneys' fees and $258,-613.41[9] for expenses. We GRANT Plaintiffs' Motion for Attorneys' Fees and Expenses, with the exception of the request for incentive awards.

## CONCLUSION

Accordingly, we GRANT the Joint Motion to Approve the Class Action Resolution (doc. 269) and we GRANT IN PART Class Counsel's Motion for Attorneys' Fees and Expenses (doc. 285). We ORDER the Parties to submit further briefing on the issue of incentive awards within ten (10) days of the date of this Order.

Finally, with respect to Plaintiffs' motion for an order directing Attorney General Betty Montgomery and all counsel for Defendants to cease and desist from conduct in violation of the MOU and General Protocol (doc. 328), we ORDER the Parties to brief the issues raised by the Court at the Fairness Hearing. We note that Defendants have not responded to Plaintiffs' motion as of this date. The Parties' briefs on this issue are also due within ten (10) days of the date of this Order.

SO ORDERED.

---

9. The total expenses of Class Counsel are $308,-613.41. Class Counsel request $50,000 in incentive awards. Therefore, the total expense, minus the amount designated for incentive awards, equals $258,613.41.