**In re TELECTRONICS PACING SYSTEMS, INC., Accufix Atrial "J" Leads Products Liability Litigation.**

No. MDL–1057.

United States District Court,
S.D. Ohio,
Western Division.

March 5, 1999.

Ronald Richard Parry, Arnzen Parry & Wentz PSG, Covington, KY, for Eugene H. Owens and Elise Marie Owens.

Frank Chester Woodside, III, James Albert Comodeca, lber, Dinsmore & Shohl, Cincinnati, Ohio, Charles P. Goodell, Jr., Richard M. Barnes, Goodell DeVries Leech & Gary, Baltimore, MD, for TPLC Inc dba Telectronics Pacing Systems Inc., defendant.

Frank Chester Woodside, III, Dinsmore & Shohl, Cincinnati, Ohio, Charles P. Goodell, Jr., Goodell DeVries Leech & Gary, Baltimore, MD, for Telectronics Holdings Ltd., defendant.

Gerald Joseph Rapien, Daniel R. Warncke, Taft, Stettinius & Hollister, Cincinnati, OH, for Telectronics Pty Limited, defendant.

Gerald Joseph Rapien, Daniel R. Warncke, Taft, Stettinius & Hollister, Cincinnati, OH, S. Patrick McKey, Gardner Carlton & Douglas, Chicago, IL, for Pacific Dunlop Limited, Nucleus limited, movants.

Virginia Conlan Whitman, Cincinnati, OH, for Virginia Conlan Whitman, special master.

## I. INTRODUCTION

SPIEGEL, Senior District Judge.

This case involves a nationwide products liability action, alleging that Defendant TPLC Holdings, Incorporated (formerly Telectronics Pacing Systems, Incorporated) and Defendants Accufix Research Institute, Incorporated (formerly TPLC, Incorporated ("TPLC"))[1] as well as Pacific Dunlop Limited ("Pacific Dunlop" or "PDL") and Nucleus Limited ("Nucleus") (collectively referred to as the "Australian Defendants"), placed into

---

1. For the purposes of this opinion, TPLC and Accufix Research Institute ("ARI") refers to the same company.

the stream of commerce defective Accufix Atrial "J" pacemaker leads, Model 330–801 and Model 329–701 (hereinafter referred to as " 'J' Lead").

On November 19, 1998, the Court held a hearing on the Plaintiffs' Steering Committee's Motion To Approve The Proposed Class Action Settlement and Mandatory Class Certification, and on the PSC's Application for Attorneys' Fees and Reimbursement of Costs ("November 19th hearing"). The Court also ordered the parties to return on December 10, 1998 for a hearing on the issue of attorneys' fees and reimbursement of expenses in this matter ("December 10th hearing").

At the November 19th hearing, the Court also heard oral arguments from members of the Plaintiffs' Steering Committee ("PSC") in support of class certification and settlement approval as well as arguments made in support of the proposed settlement by attorneys representing Defendants TPLC, PDL, and Nucleus.

Additionally, the Court heard argument presented by Special Counsel on behalf of the PSC, Professor Arthur Miller.[2] Professor Miller outlined the procedural legitimacy of advancing this matter as a mandatory non-opt out class under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure. Dr. Alan Hillman, Associate Professor of Medicine and Associate Professor of Health Care Management at the School of Medicine and the Wharton School of the University of Pennsylvania, also testified to show that the amount of monies allocated to the Patient Benefit Fund is ample enough to cover the Plan of Allocation drafted by Class Counsel. Finally, economist Dr. Harvey Rosen testified as to whether a limited fund existed in this case and whether there were enough monies in the Patient Benefit Fund to satisfy litigation expenses, settlements, claims, and other reporting requirements that the Defendants would be obligated to pay the class if certified.

As of the November 19th hearing, the class totaled over 17,000 members with the average age of 78 years. A number of the members were present at the hearing, and they received an opportunity to be heard on the record. Those individuals described their injuries and commented on the proposed settlement and non-opt out class certification issue. There were fifty-three (53) objections to the settlement filed with the Court at the time of the hearing. A number of the objectors were present at the hearing and their objections were heard by the Court.

Subsequently, at the December 10th hearing, the Court heard arguments from the PSC regarding attorneys' fees and reimbursement of litigation expenses, including fees and out-of-pocket expenses for a number of the private individual plaintiffs' counsel.

Both Defendants and Class Counsel diligently litigated this action, providing the Court with a significant amount of briefing, memoranda of law citations, submissions and testimonials and other evidence. Nevertheless, having reviewed and considered all of the briefs, points of authority, and supporting documents filed with the Court, as well as considering the oral arguments, testimony, documentary evidence, declarations, and objections made on the record at the November 19th and December 10th hearings, the Court is now prepared to rule on the PSC's Motion To Approve The Proposed Class Action Settlement and Mandatory Class Certification, and on the PSC's Application for Attorneys' Fees and Reimbursement of Costs. This Opinion and Order sets forth the Court's ruling on these matters.

## II. OVERVIEW OF COURT'S CONCLUSION

After reviewing the entire settlement, we conclude that the settlement fair, adequate, and reasonable in this case. Therefore, we GRANT Plaintiffs' Steering Committee's Motion To Approve The Proposed Class Action Settlement and Mandatory Class Certification. Furthermore, we GRANT PSC's Attorneys' Fee Application, which requests 28% of the Patient Benefit Fund, to the

---

2. Although Attorney Arthur Miller submitted a Declaration as an expert witness in this case, at the request of counsel for one of the Objector's, this Court struck Professor Miller's Declaration and considered him as a Special Counsel appearing on the Plaintiffs' Steering Committee's behalf.

extent that Class Counsel is AWARDED 28% of the net Patient Benefit Fund (the gross Patient Benefit Fund minus the out-of-pocket expenses of Class Counsel and the private contingency counsel and also the incentive payments to certain class members). In addition, we conclude that the attorneys' fees are to be paid at the same time annually in installments over four years subsequent to the initial payment. Class Counsel is AWARDED the costs of its out-of-pocket expenses in the amount of $2,243,771.93. Private contingency attorneys are also AWARDED their costs of out-of-pocket expenses in the amount of $441,991.79. Finally, special payments are awarded to certain class members for their assistance in this litigation in the total amount of $141,000.00. The individual class members include: Harold Bechert, Jamie Baldwin, Bruce Hopkins, Annette Catale, Charles Harvey, James Lloyd, Cecilia Plummer, Robert Uden, Helen West, Mary Williams, Urban Wittenberg, Executor of the Estate of Inphasouk Soumphonphakdy, Martha Sweet, Chad Baker, Shelly Truskowski, Eva Soboleski, Jerri Stayer, Lyle Larson, Constance Dromenhauser, Michael Kingera, O.T. Edwards, Ronald Taylor, Robert Starr, John Collins, Wilford Schultz, Lawrence Cheyne, Gregory Penzenik, and the Estate of Elsie Fretz.

### III. BACKGROUND

#### A. Consolidation

On February 13, 1995, Plaintiff Eugene Owens filed a class action lawsuit in the United States District Court for the Southern District of Ohio, alleging injury due to a defective "J" lead pacemaker that was manufactured by TPLC.[3] Subsequently, on March 10, 1995, Plaintiffs moved to certify their action as a class action. The MDL then took jurisdiction of this litigation, consolidating all cases for pretrial purposes and transferring them to this Court. On July 14, 1995, the Court issued its first Case Management Order, consolidating for pretrial purposes all cases that are part of MDL–1057, appointing a Plaintiffs' Steering Committee to coordinate discovery and other pretrial proceedings, designating Attorney Stanley M. Chesley, of the law firm Waite Schneider, Bayless

& Chesley Co., to serve as Lead Counsel of the PSC, appointing Liaison Counsel, Richard S. Wayne, of the firm Strauss & Troy, to serve as Plaintiffs' Liaison Counsel, and setting a briefing schedule on the motion for class certification.

The Court issued a second Case Management Order on August 14, 1995, establishing a joint Plaintiffs–Defendants federal-state document Depository ("document depository") located in the United States Potter Stewart Courthouse in Cincinnati, Ohio. By August 19, 1997, a total of 435 cases had been transferred to the Southern District of Ohio by the MDL Panel, of which 409 remain active in the transferee district.

On July 20, 1995, Plaintiffs filed an Amended and Consolidated Master Class Action Complaint, alleging causes of actions against TPLC, PDL and Nucleus for (1) strict liability; (2) negligence; (3) failure to warn; (4) breach of implied warranty; (5) breach of express warranty; (6) fear of future product failure; (7) intentional infliction of emotional distress; (8) fraud; (9) misrepresentation; (10) medical monitoring; and, (11) loss of consortium. Thereafter, on November 17, 1995, the Court certified the class as including: all persons worldwide who have had the Accufix atrial "J" pacemaker Leads, including the retention wire, Model 330–801, Model 329–701, and Model 088–812, placed in their bodies. The Court then ordered that the class be certified on the common issues of negligence, strict liability, fraud, misrepresentation, and breach of warranty. Also, the Court ordered that a medical monitoring class be established. The Court, however, denied class certification for issues regarding causation and damages.

Defendants then moved for this Court to reconsider its Order certifying the class, or, in the alternative, for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). On February 23, 1996, after reviewing Defendants' motion for reconsideration, the Court granted in part and denied in part the motion and denied Defendants' request for an interlocutory appeal. Consequently, the Court decertified the international class and reaffirmed our decision certifying a class that included Unit-

---

3. *Eugene Owens v. TPLC, Inc.,* Case No. 1:95–87.

ed States class members. Although the court did not decertify the United States class at that time, the Court later decertified the class on July 16, 1996, in light of the Sixth Circuit's decision *In re American Medical Sys.*, 75 F.3d 1069 (6th Cir.1996) and other cases.[4]

On September 29, 1996, Plaintiffs renewed their motion for class certification. The Court granted the motion on April 2, 1997, recertifying a nationwide class of "J" lead implantees with sub-classes for the claims of negligence, strict liability, and medical monitoring. Defendants appealed the decision and filed a petition for a writ of mandamus with the Sixth Circuit Court of Appeals to vacate our recertification decision. The Sixth Circuit denied Defendants' petition for a writ of mandamus and dismissed the interlocutory appeal for lack of jurisdiction. Although Defendants sought a rehearing of the denial of the petition for a writ of mandamus, the Sixth Circuit rejected Defendants' request.

The Court also considered the Australian Defendants' motion to dismiss for lack of personal jurisdiction. However, we denied the motion on February 3, 1997.

On December 1, 1997, the Court also denied Defendants' Motion for Reconsideration of the Court's certification of subclasses one and two, which relate to medical monitoring. Subsequently, on December 3, 1997, the Court approved the Joint Plan for Notice of Pendency of Class Action.

**B. The Summary Jury Trial**

 ■ This Court held a summary jury trial in this case, beginning on February 2, 1998 and ending on February 6, 1998.[5] Among the summary jury's findings were the following decisions regarding the liability of the Defendants:

First, TPLC was negligent. Second, TPLC was negligent *per se* for failing to comply with federal regulations in their filings with the Federal Drug Administration ("FDA"). Third, with respect to the Strict Liability sub-classes:

Sub–Class 5—The "J" lead sold by the Telectronics Defendants failed to perform as safely as an ordinary consumer would expect when they left the possession of the Telectronics Defendants, and this was the proximate cause of injury to the Plaintiffs, and that the activities of the Telectronics Defendants had the capacity to harm the class members as a whole.

Sub–Class 7A—TPLC knew of the risks of fracture. Although TPLC did not fail to provide a warning that a reasonable manufacturer would have provided concerning the risk, the company failed to provide post-market warning that a reasonable manufacturer would have provided concerning the risk; and TPLC's activities had the capacity to cause harm to the class members as a whole.

Sub–Class 7B—The "J" Leads were unsafe to the extent that beyond that which would be contemplated by an ordinary consumer; The seriousness of the injury or the unsafe nature of the design of the "J" Leads was a proximate cause of the Plaintiffs' injuries. Furthermore, even though the warnings at the time of the manufacture regarding the risks associated with the "J"Leads were not inadequate, after the product was manufactured, TPLC did learn or should have learned about the dangers connected with the "J" Leads; however, TPLC did not issue warnings concerning the dangers in a manner that a reasonable product manufacturer would act in the same or similar circumstances, and the activities of TPLC had the capaci-

---

4. *Matter of Rhone–Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir.1995); *Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir.1996); *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996).

5. While we realize that the summary jury trial is merely advisory, of no binding effect on anyone, we note that it is a settlement device used to assist the parties in assessing the results of a trial on the merits. From the experience of this Court

in other cases, including class actions, where there have been a summary jury trials, the results have been very instructive in helping the parties negotiate settlements. Furthermore, utilization of the summary jury trial technique in this case assisted the Court and the parties in determining whether trial on the merits was manageable. The results of the summary jury trial in this case confirmed that a trial on the merits would be manageable.

ty to cause harm to the class members as a whole.

Sub–Class 7A—At the time of manufacture of the "J" Leads, there was an alternative design which was capable of preventing the type of injury the Plaintiffs allege; The seriousness of the injuries alleged outweighed the burden of the Telectronics Defendants to use the alternative design; The injuries alleged by Plaintiff resulted from a reasonably anticipated use of the "J" Leads. Additionally, after the product was manufactured, the Telectronics Defendants did or should have learned of the danger of injury to recipients of the "J" Leads; nevertheless TPLC failed to use reasonable care to provide an adequate warning of such characteristic and its dangers to the "J" Leads. Finally, the Telectronics Defendants' activities had the capacity to cause harm to the class members. Sub–Class 8—The "J" Leads failed to perform in a safe way that an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; The risk of danger inherent in the design outweighs the benefits of the design; The failure of the "J" Leads to perform safely or a risk of danger existed at the time the product left the control of the Telectronics Defendants, and that failure or risk was a cause of the Plaintiffs' injuries; The use of the "J" Leads involved a substantial danger that was not readily recognized by the Plaintiffs and that the Telectronics Defendants knew or should have known of that danger; Telectronics Defendants failed to give adequate warnings of such danger and that the failure to warn was the cause of injury to the Plaintiffs; and, The activities of the Telectronics Defendants had the capacity to cause harm to the class as a whole.

The "J" Leads were defective due to a defect in design, and the manufacturer knew, or in light of reasonably available scientific and technical knowledge then existing could have known, of the design characteristic or its danger that caused the Plaintiffs' injuries or of the alternative design identified by the Plaintiffs.

Thus, assuming that the jury found TPLC liable on any of Plaintiffs' theories of liability, the summary jury advised that Plaintiffs would recover damages in the amount of $265,000,000.00 for the costs of medical monitoring and the costs and testing procedures. The Class representatives were awarded a total recovery of $7,750,000.00.[6] The summary jury found that Plaintiffs were not entitled to punitive damages under any of the three standards of proof, i.e. by a preponderance of the evidence, or by clear and convincing evidence, or beyond a reasonable doubt.

As to Plaintiffs' claims against the Australian parent corporations, PDL and Nucleus, were not liable under any agency theory.

## C. The Settlement

Following the summary jury trial, and after allowing the parties to review the strengths and weaknesses of their cases in light of the summary jury's findings, settlement discussions were begun by the Parties and the Court assisted the Parties at settlement conferences on March 19, 1998 and March 26, 1998. Subsequently, on April 2, 1998, the Parties informed the Court that they had agreed to a settlement in principle.

On July 22, 1998, the Parties presented a Joint Motion for Order Provisionally Certifying a Mandatory Class Action pursuant to Fed.R.Civ.P. 23(b)(1)(B), Approving Settlement, Forms of Notice to the Class Members, Scheduling a Final Fairness Hearing, and Preliminarily Enjoining All Accufix Litigation. Following a hearing, the Court indicated tentative approval of the proposed settlement by approving the form and manner of dissemination of notice to prospective class members, and temporarily enjoining all Accufix Atrial "J" Lead litigation. The court scheduled the Fairness Hearing for November 19, 1998, and provided for objectors and their counsel to be heard at the hearing.

---

**6.** The award the summary jury indicated that the Class representatives would be entitled to is as follows: (1) Chad Baker—$1,000,000.00; (2) Wilford Schultz—$2,000,000.00; (3) Jerri Stayer—$150,000.00; (4) Shelly Truskowski— $1,600,000.00; (5) Rattana Soumphonphakdy (deceased)—$3,000,000.00; and (6) Jamie Baldwin, Harold Bechert, and Annette Catale would receive no damages.

On August 3, 1998, Class Counsel and the Defendants jointly filed a motion seeking an Order appointing a Settlement Master to fulfill the settlement goals. On August 11, 1998, the Court appointed Attorney Virginia C. Whitman to serve as Settlement Master.

Notice was provided to the Class regarding the class action and proposed settlement, and the date and time for the Fairness Hearing via advertisements ("notice materials") in *USA TODAY*, a nationally distributed newspaper, on September 25, 1998 and October 2, 1998. Also, notice materials were sent by first class mail to potential class members on September 14, 1998 and October 10, 1998. Any inquiries regarding the notice of the settlement and hearing dates were taken and responded to by Star Bank, N.A., of Cincinnati, Ohio, Virginia Whitman, Esq. and the PSC. As of the date of the November 19th Hearing, fifty-three (53) out of the total class of 17,366 individuals filed Objections and Letters in opposition to the proposed settlement.

## D. The Settlement Agreement

The Settlement Agreement is summarized as follows:

There shall be four (4) funds established and funded by the Telectronics Defendants: (1) Patient Benefit Fund, (2) Operating Fund, (3) Litigation Fund, and (4) Reserve Fund.

First, a Patient Benefit Fund will be established in which TPLC will deposit $47,275,-297.00 and PDL will deposit $10,000,000.00 into the fund. The amount in the Patient Benefit Fund will be used to pay "J" Lead related claims.

Five Categories of Qualified Settlement Class Members will be established for the purposes of the Patient Benefit Fund with each receiving different compensation as a subgroup. The categories and plan of allocation of payments from the Patient Benefit Fund will be as follows:

(1) Category 1 shall consist of Qualified Settlement Class Members with "J" Leads still implanted in their body at the time of final approval. Category 1 Qualified Settlement Class Members filing a timely claim shall receive $500.00, and be entitled to receive reimbursement out of the Patient Benefit Fund for reimbursed medical expenses relating to fluoroscopies. To receive payment, a Category 1 Qualified Settlement Class Member must file a proof of claim with the Settlement Master within sixty (60) days after Final Approval. The spouses of each Category 1 Qualified Settlement Class Member who was married as of the date of the Final Approval shall receive $100.00.

Any Category 1 Qualified Settlement Class Member who waives his or her right to receive the $500.00 because of his or her failure to file a timely proof of claim will nonetheless be entitled to participate in the medical monitoring program.

Claims of Category 1 Qualified Settlement Class Members can only be submitted by or on behalf of persons living as of July 22, 1998.

Finally, any Category 1 Qualified Settlement Class Member who fails to file a Proof of Claim to receive a distribution from the Patient Benefit Fund in the time provided for shall have waived his or her right to receive money as a member of Category 1, and the funds that would have been distributed to such class members will be used for Categories 2, 3, 4, or 5 as determined by the Settlement Master.

(2) Category 2 Qualified Settlement Class Members shall receive a payment of $4,500.00 or $10,000.00.[7] Category 2 Qualified Settlement Class Members who have undergone an extraction procedure without minor complications or, an extraction that resulted in a Minor Complication or, who have experienced a fracture and whose Lead (or a portion of their Lead) is still implanted in their body but has not resulted in any complications, shall receive a payment of $4,500. Category 2 Qualified Class Members who experienced a fracture

7. The Court notes that while the term "or" is stated in the language of the Settlement Agreement in regards to the award amount a particular member of a category can receive, the term is an actual indication of the range that the Settlement Master may, in her discretion, recommend to be paid to the Qualified Settlement Class Member. Moreover, the Parties stipulated that the Settlement Master shall have the discretion to recommend to the Court a payment within the ranges established in Categories 2–5 where appropriate. *See* doc. 654 at subsection (y).

and whose Lead (or a portion of their Lead) is still implanted in their body and has caused a Minor Complication shall receive a payment of $10,000.00.

A Proof of Claim for Category 2 Qualified Settlement Class Members must be filed by March 1, 1999 or within sixty (60) days of Final approval, or within ninety (90) days of discharge from a hospital or a diagnosis of fracture with a recommendation against extraction, whichever is later. Category 2 Qualified Settlement Class Members must also provide verification that the reason for the extraction was directly related to their Lead, or that their Lead is fractured, or that the implanted but fractured Lead caused a Minor Complication. Minor Complications include but are not limited to, extended procedure time, some discomfort to the patient, or other minor complication as may be determined by the (Settlement) Master.

The spouse of each Category 2 Qualified Settlement Class Member who was married as of the date of the Final Approval and remained married at the time the claim arose shall receive a payment of $250.00.

(3) Category 3 Qualified Settlement Class Members who have experienced a Major Complication shall receive payment of $20,-000.00 or $40,000.00, depending upon satisfaction of the following criteria: in order to establish a Major Complication and be entitled to receive $40,000.00, a Category 3 Qualified Settlement Class Member must file a Proof of Claim with the Master by March 1, 1999, or within sixty (60) days of Final Approval, or within ninety (90) days of discharge from the hospital, whichever is later, provided that it is established that he or she has undergone an extraction procedure which resulted in either: (a) a

thoracotomy; (b) cardiac arrest; (c) four (4) of sixteen (16) complications that may result;[8] or (d) establishes that the Lead is still implanted in his or her body, but is fractured and the fracture has resulted in four of sixteen specific complications.[9] To be entitled to payment a Category 3 Qualified Settlement Class Member must be able to verify the complications directly related to his or her Lead with medical records and a notarized statement from the Qualified Settlement Class Member's treating physician.

In order to establish a Major Complication, and be entitled to receive $20,000.00, a Category 3 Qualified Class Settlement Members must file a claim with the [Settlement] Master by March 1, 1999 or within sixty (60) days of Final Approval, or within ninety (90) days of discharge from the hospital, whichever is later, provided that it is established that he or she experienced three (3) of the sixteen (16) complications specifically listed and that the complications are directly related to his or her Lead, as documented by their medical records and a notarized statement from the Qualified Settlement Class Member's treating physician.

Finally, each spouse of a Category 3 Qualified Settlement Class Member who was married as of the date of Final Approval and remained married at the time the claim arose shall receive payment of $500.00.

(4) Category 4 Qualified Settlement Class Members who are Permanently and Totally Disabled, and whose Permanent and Total Disability is directly related to their Lead, shall receive $100,000.00, plus lost income calculated as the sum of (I) a percentage of the "adjusted current annual income"[10] equal to the number of days

---

**8.** The complications include: (1) hospitalization in an intensive care unit for more than 24 hours; (2) additional surgical intervention; (3) permanent injuries proximately resulting from extraction; (4) subsequent infection that resulted in medical attention; (5) a hospital stay longer than four days; (6) cardiac tamponade; (7) vascular injury (tears, thrombi, emboli, valvular damage); (8) pericardial effusion; (9) myocardial perforation; (10) hemothorax; (11) pneumothorax; (12) blood transfusion; (13) systematic infection; (14) an extraction on an emergency or expedited basis as a result of a fracture of their Lead; (15)

attempts to extract the recipient's Lead that were unsuccessful; or (16) extensive additional medical care or intervention.

**9.** *See id.*

**10.** "Adjusted current annual income" means 78.5% (which percentage is calculated to reflect fringe benefits as well as personal maintenance expenditures) of the Qualified Settlement Class Member's average actual income from wages, salaries, personal services, personal business activities or other form of income from self employ-

from the date of Permanent and Total Disability to the end of the year divided by 365, and (ii) the present value of future "adjusted current annual income" beginning the year following the Permanent and Total Disability, ending the year of the Qualified Settlement Class Member's 62nd birthday and discounted to the year of the Permanent and Total Disability as a net interest rate of 1.5% (which percentage is calculated as the difference between a 5.5% growth and a 7.0% discount rate).

Under Category 4, a Settlement Class Member does not qualify for compensation if he or she was unable to perform the usual duties or activities of Vocation or Self Care prior to the fracture of the Lead, explant of the Lead or attempted or incomplete explant of the Lead.

Also, a spouse of a Category 4 Qualified Settlement Class Member who was married at the time of Final Approval and remained married at the time the claim arose shall receive a payment of $50,-000.00.

(5) Category 5 Qualified Settlement Class Members who died as a result of a Lead fracture or as a result of a procedure to extract the Lead shall receive compensation equal to the sum of (a) through (c) below; provided that in no event shall the total payment be less than $200,000.00 or more than $1,000,000.00. In order to establish the cause of death, a Qualified Settlement Class Member's estate must file a Proof of Claim with the Settlement Master by March 1, 1999, or within sixty (60) days of Final Approval, or within ninety (90) days of the death of a Qualified Settlement Class Member, whichever is later, together with either:

(I) the certificate of death indicating the cause of death to be from fractured Lead, cardiac tamponade, complications from an attempted extraction procedure or any other cause related to the fractured Lead; or

(II) a notarized statement from a coroner (or in the case of an extraction-related death, from the extracting surgeon) indicating the cause of death to be any of those enumerated in sub-paragraph (I), *supra.*

Under Category 5, the estate of a Class Member shall be compensated as follows:

(A) $200,000.00;

(B) $200,000.00 multiplied by the number of minor children (under 18 years of age as of the decedent's date of death), if any, that the Qualified Settlement Class Member had at the time of death, plus income, plus $150,000.00 for the spouses.

(C) the Qualified Settlement Class Member's lost income, calculated as the sum of (I) a percentage of the "adjusted current annual income" equal to the number of days from the date of death to the end of the year divided by 365, and (ii) the present value of future "adjusted current annual income" beginning the year following the death, ending the year of the Qualified Settlement Class Member's 62nd birthday and discounted to the year of the death at a net interest rate of 1.5% (which percentage is calculated as the difference between a 5.5% growth and a 7.0% discount rate).[11]

(D) The spouse of any Category 5 Qualified Settlement Class Member, if they are married as of the date of death shall receive a payment of $150,000.00.

We note that "[a] Qualified Settlement Class Member who already filed a claim in one category and later experienced an event that would enable him or her to file a second a claim in another category may do so, sub-

---

ment, as reported on his or her federal income tax return over the three years prior to the year of Permanent and Total Disability. If the Qualified Settlement Class Member has no such income or is age 62 or older at the time of permanent disability, then there is no payment under this component of the formula. (*See* Second Submission of Amended Summary Plan of Allocation, doc. 654 at 6).

**11.** Under Category 5, the "adjusted current annual income" means 78.5% (which percentage is calculated to reflect fringe benefits as well as personal maintenance expenditures) of the Qualified Settlement Class Member's average actual income from wages, salaries, personal services, personal business activities, or other form of income from self employment, as reported on his or her federal income tax return over the three years prior to the year of death. Further, if the Qualified Settlement Class Member has no such income or is age 62 or older at the time of death, then there is no payment under this component of the formula. (*See* Second Submission of Amended Summary Plan of Allocation, doc. 654 at 8).

ject to a reduction in the compensation previously paid out for his or her claim."

In regards to those persons in Categories 1 and 2 above, the Settlement Agreement calls for them to receive the full amount of compensation that they are entitled to after Final Approval of the Settlement. However, in regards to Categories 3 through 5 above, in order to protect the Patient Benefit Fund, the Parties agreed that Qualified Settlement Class Members will receive 50% of the compensation that they are entitled to after Final Approval of the Settlement and the remaining 50% of their award will be held back temporarily (the " 'holdback' provision"). The reason for the "holdback" provision is to allow the Settlement Master, in a period of not more than five (5) years, to make an assessment of the status of the Settlement Class and estimate the number of existing future claims that may reduce the Patient Benefit Funds. Specifically, the Settlement Agreement states,

> The [Settlement] Master shall, no later than two (2) years from Final Approval, retain a consultant to assess the status of the Settlement Class, including the number of surviving Class Members implanted with the Lead, the reported J-wire related injuries, Lead extractions, complications from Lead extraction, total and permanent disabilities and deaths associated with the Lead, to estimate the number of existing and future claims which may reduce the Patient Benefit Fund.

(*See* Second Submission of Amended Summary Plan of Allocation, doc. 654 at 9–10).

Although the PSC used its best efforts to allocate the monies in the Patient Benefit Fund to the Qualified Settlement Class Members, the Settlement Master may determine that an adjustment is necessary in the allocation of monies. (*See id.* at 10). Moreover, the Settlement Master, in consultation with the PSC and with approval of the Court, may alter the plan of allocation contained in the Settlement Agreement to increase or decrease the total payments to be received by the Qualified Settlement Class Members. (*Id.*).

In exercising her best judgment under each circumstance, the Settlement Master shall have discretion to: (1) determine whether the documentation submitted by the Class Member is sufficient to establish that the Class Member is entitled to receive benefits under the Settlement Agreement; (2) reallocate the remaining money in the Patient Benefit Fund after all payments are made to Qualified Settlement Class Members in Categories 1–5 so that additional distributions are made to Categories 2–5, as long as approval is given from the Court; (3) process requests for payment of medical bills and related costs for extractions and fluoroscopies as emergency requests on an expedited basis.

Second, an Operating Fund shall be created by TPLC depositing $10,000,000.00 initially, and, ten (10) days after the Final Approval of the Settlement Agreement, depositing the balance of the remaining cash held by TPLC after the establishment of the Patient Benefit Fund and Litigation Fund. The monies deposited in the Operating Fund will be used by TPLC to pay operating expenses, with the exception of those expenses paid from the Litigation Fund and the Reserve Fund (i.e. the amount necessary to comply with ongoing obligations with the FDA). Any unused portion of the monies in this fund will revert to the Patient Benefit Fund.

Third, a Litigation Fund will be established, into which TPLC will deposit $6,765,-528.00. The monies in the Litigation Fund will be used by TPLC to pay expenses for other disputes not related to the 701 and 801 "J" Leads the subject of the litigation. Any unused portion of the monies in this fund will revert to the Patient Benefit Fund.

Finally, a Reserve Fund will be established, into which TPLC will deposit $4,000,-000.00. The monies in this fund will be used by the Defendants to pay litigation expenses associated with the 701 and 801 "J" Lead. Any unused portion of the monies in this fund will also revert to the Patient Benefit Fund.

Additionally, in reaching the settlement, the PSC entered into an agreement with the Health Care Financing Administration (HCFA), providing that in consideration of $5,000,000.00 paid by TPLC on behalf of itself and all Medicare beneficiaries in the United States, the United States would release and forever discharge them from any

and all past, present, and future claims by the United States for expenses relating to medical treatment made necessary by the Leads. In addition, the Department of Health and Human Services agreed to relinquish all rights to any portion of any judgment, settlement, claim, or collection related to medical expenses pursuant to the terms of the settlement. Thus, the PSC contends that the agreement with HCFA provides a significant benefit to the Class because it protects monies that will be available in the Patient Benefit Fund.

The PSC contends that the primary reason for seeking certification of this class action as a mandatory non-opt out class under Rule 23(b)(1)(B) is because TPLC has only limited funds, and that the proposed settlement would not be possible and the claims satisfied if the Settlement Agreement is not drafted in the above manner. Moreover, the PSC proffers the analysis of Dr. Hillman in support of its assertion that, after evaluating the amount of money available for the class members on a conservative basis, the manner that the settlement is drafted is the only way to insure that present and future Class Members receive appropriate compensation for their claims. Furthermore, the PSC asserts that the "holdback" provision in regards to categories 3 through 5 is primarily to insure that there is sufficient funds to take care of future claimants. Noting Dr. Hillman's curriculum vitae, we find him qualified to testify as to the settlement in this case.

Class Counsel also seeks an award of attorneys' fees of 28% of the total amount of benefits obtained for the Settlement Class to be paid out of the Patient Benefit Fund and Reserve Fund, a reimbursement of their out-of-pocket expenses and the out-of pocket expenses of the private contingency counsel, and incentive awards for certain class members who assisted in this matter.

## IV. DISCUSSION

### A. Historical Analysis of Federal Rule 23

Historically, the class action principle finds its roots in the Bill of Peace, created by the English Court of Chancery. *See* 7A A.

Wright, Miller & Kane, *Federal Practice & Procedure,* § 1751 at 7 (1986). Bills of Peace were primarily used as a rule of convenience. In disputes involving common questions of law and fact and multiple parties whereby joinder was impracticable, the English court would facilitate the adjudication by allowing a minute number of individuals to serve as representatives of the group's common interests. *Id.* at 8. The resulting judgment was binding on all members of the group regardless of whether they were present in the action or not. *Id.* (citing *Adair v. New River Co.,* Ct.Ch. 1805, 11 Ves.Jr. 429, 32 Eng.Rep. 1153) *see also* 1 H. Newberg and Alba Conte, *Newberg on Class Actions,* §§ 1.09 (3d ed.1992); 1 J. Pomeroy, *Equity Jurisprudence,* §§ 252, 253 (1918); Chafee, *Bills of Peace with Multiple Parties,* 45 Harv.L.Rev. 1297 (1932).[12]

In 1842, the Bill of Peace found its way into the legal system of the United States through the promulgation of Equity Rule 48. Rule 48 recognized representative class action-type suits where the parties on either side of the dispute were too numerous to be conveniently brought before the court. However, contrary to the Bill of Peace, Rule 48 did not bind absent parties to the resulting judgments. Essentially, Rule 48 provided the courts with a convenient device to maintain class action-type suits, while at the same time insure that the interests of all of the members of the class-both present and absent-were properly protected. *Smith v. Swormstedt,* 57 U.S. (16 How.) 288, 302–303, 14 L.Ed. 942 (1854) Federal courts applied Equity Rule 48 from 1842 to 1912.

In 1912, Federal Equity Rule 38 ushered in a revision to Rule 48 of the Federal Equity Rules. Like Equity Rule 48, Rule 38 allowed representative class action-type suits. However, in contrast to Equity Rule 48, Rule 38 established that absent parties could be bound by subsequent judgments pursuant to this rule. *Supreme Tribe of Ben–Hur v. Cauble,* 255 U.S. 356, 363–64, 41 S.Ct. 338, 65 L.Ed. 673 (1921); 7A A. Wright, Miller &

---

**12.** *See also Hom v. Tenants of Bromsarove,* 22 Eng.Rep. 277 (Ch.1681); *Brown v. Vermuden,* 22 Eng.Rep. 802 (Ch.1676).

Kane, *Federal Practice & Procedure*, § 1751 at 13.

In 1938, Rule 23 of the Federal Rules of Civil Procedure emerged, dividing class actions into three categories: (1) spurious; (2) true; and (3) hybrid actions.[13] In 1966, an amendment to Rule 23 repudiated the categorical scheme and set forth clear prerequisites to Rule 23(a) and three categories that the class action must fall within under 23(b). 7A A. Wright, Miller & Kane, *Federal Practice & Procedure*, § 1752 at 44. Of the 3 categories under 23(b), only 23(b)(3) allows the litigants the option to opt out of pursuing their claims in a unified proceeding merely because their claims share legal and factual allegations. *See* Fed.R.Civ.P. 23(b)(3). Thus, we note that, in examining the evolution of the class action procedural device from the English Chancery courts' application of the Bill of Peace through the Advisory Committee's development of Rule 23(b) in 1966, we find that historically only 23(b)(3) provided a litigant the right to opt-out, not 23(b)(1) or (b)(2). In the case at hand, the PSC seeks to certify the class pursuant to Rule 23(b)(1)(B) which, as indicated, is a mandatory non-opt out provision.

### B. Defendants' Financial Condition

To establish TPLC's financial condition, the PSC proffers the report and in-court testimony of economist Harvey S. Rosen, Ph.D. Dr. Rosen's curriculum vitae shows that he has conducted numerous investigations and analyses and testified in a number of large class actions and mass tort cases. *See, e.g., In re Rio Hair Naturalizer Products Liability Litig.*, No. MDL 1055, 1996 WL 780512 (E.D.Mich. Dec. 20, 1996); *In re Silicone Gel Breast Implant Products Liability Litig. v. Mentor Corp.*, Nos. CV 93–P–11433–S & CV 92–P–10000–S, MDL No. 926, 1993 WL 795477 (N.D.Ala. June 2, 1993); *Day v. NLO, Inc.*, 147 F.R.D. 144 (S.D.Ohio 1993); *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141 (S.D.Ohio 1992). Noting Dr. Rosen's curriculum vitae as well as his extensive background in cases similar to the one before

the Court, we find that Dr. Rosen is qualified to testify as an expert in this litigation.

Dr. Rosen conducted an investigation and evaluation of TPLC's assets and earning capacity, resources, and potential liabilities and expenses to determine whether TPLC could satisfy potential claims against it by individual plaintiffs. Dr. Rosen testified that Defendant TPLC fully cooperated with his investigation. He was provided with TPLC's financial statements and balance sheets, audited financial statements and statements of opinion by TPLC's auditor's K.P.M.G. Dr. Rosen requested and received the balance sheets showing TPLC's assets prior to the sale of its assets in 1996 and the most recent statement of June 30, 1998. Dr. Rosen visited TPLC's facilities, interviewed a number of the company's officers, and reviewed declarations and affidavits of many other officers. Dr. Rosen also reviewed a copy of the Settlement Agreement in order to understand some of the general provisions and make an assessment of the assets in regards to meeting the standards therein. Finally, Dr. Rosen examined the summary jury trial findings and the values the jury placed on the issues where liability was found.

Dr. Rosen testified that his analysis of TPLC's ability to satisfy individual judgments against the company also takes into account the legal defense costs, settlements and judgments, and the need to comply with the mandatory reporting requirements. After noting that there is not an issue of insurance proceeds being available in this case, Dr. Rosen concluded that TPLC could not, as a practical matter, satisfy individual judgments against it because, as of June 30, 1998, TPLC's assets totaled only approximately $83 million with the company having no operating income. In his report, Dr. Rosen emphasized that:

> [TPLC's] funds are so limited that there is a substantial probability, almost a certainty, that if damages are awarded in individual litigation against [TPLC], the claims of earlier litigants would exhaust [TPLC's]

---

**13.** We note that the fact that three categories were created within Rule 23 only created problems in the courts trying to pigeon-hole the facts of any one case into one of the three categories. 7A A. Wright, Miller & Kane, *Federal Practice &* *Procedure*, § 1751 at 16. Furthermore, it was not clear whether the categorical label made any difference as to how the rule was to be applied. *Id.*

assets with the result that later litigants would not be able to recover on their claims. The settlement, on the other hand, immediately makes available the entire value of the company.

(doc. 609 at 10).

In support of his opinion, Dr. Rosen testified that the Class is made up of roughly 20,000 class members and that it was his understanding that approximately 500 cases have been filed against TPLC. According to Dr. Rosen, if those 500 cases proceeded to trial, the litigation expenses alone that TPLC would incur in defending itself would amount to more than $100 million. Dr. Rosen pointed out that at the time that this matter proceeded to the summary jury trial, TPLC was incurring litigation expenses at a rate of $500,000.00 to $1 million dollars per month. Dr. Rosen warned that if 500 individual cases proceeded to trial, TPLC's litigation expenses would exceed $100 million without regard to the outcome and judgments in any of those cases. Thus, regardless of getting to the specific worth of any individual case, Dr. Rosen testified that the transaction costs of litigating the 500 filed cases (representing roughly 2.5% of the overall potential cases) is greater than the funds that TPLC has available.

Dr. Rosen also testified that, even assuming that transaction costs in this case were zero, the potential value of each claim would consume the fund whereby earlier claimants would receive monies to the detriment of cases that concluded much later. Dr. Rosen indicated that the summary jury trial indicated that the average verdict is worth approximately $750,000, with a range up to $3 million for cases where death has occurred. By taking the average of $750,000 and applying it to a small percentages of the estimated 4,000 explant cases that have occurred worldwide, Dr. Rosen expressed his opinion that the settlement fund would be exhausted.

Nonetheless, Dr. Rosen urged the Court to examine the realities of the situation. Spe-

cifically, he asserted that the transaction costs will not be zero and that there will be some judgments against TPLC. Accordingly, Dr. Rosen concluded that the amount of available funds by TPLC is finite, and thus, constitutes a limited fund.

## C. Federal Rule 23(b)(1)(B)

Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure provides that:

(b) Class Action Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied,[14] and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

\* \* \*

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. . . .

Fed.R.Civ.P. 23(b)(1)(B). Having previously considered the factors of numerosity, commonality, typicality and adequacy under Rule 23(a) and concluded that the Class could be certified against TPLC, *In re Telectronics Pacing Systems Inc. Accufix Atrial "J" Leads Products Liability Litig.*, 172 F.R.D. 271 (S.D.Ohio 1997), and PDL and Nucleus for the purpose of determining parental liability, *In re Telectronics Pacing Sys., Inc.*, No. MDL–1057, slip op. at 3 (S.D.Ohio Dec. 18, 1997), we need not review the issue of the factors under Rule 23(a) being satisfied in this case. Our task is to determine whether certification of the class pursuant to Rule 23(b)(1)(B) is appropriate in this case.

At the hearing, Professor Arthur Miller argued on behalf of the PSC in relation to the Class being certified pursuant to

**14.** Pursuant to Fed.R.Civ.P. 23(a), the Prerequisites of a Class Action are:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

These prerequisites will be discussed further in this opinion.

23(b)(1)(B). First, Professor Miller averred that, regardless of whether this Court concludes that the fund is a limited fund, Rule 23(b)(1)(B) is not confined to limited fund cases. Moreover, Professor Miller argued that the language of Rule 23(b)(1)(B) indicates that it is not restricted to only such cases. Rather, "[a]ll that is needed is individual actions creating a risk of adjudications with respect to individual members of the class, which would, as a practical matter ... be dispositive of the interests of the other members not parties, or substantially impair or impede their ability to protect their interests." (Tr. at 43–44). Professor Miller asserted that Rule 23(b)(1)(B) is merely a device constructed to ensure that class members' interests are not put at risk or prejudiced simply because other members of the class want to pursue individual adjudications. (Tr. at 44).

Professor Miller also argued that, even if a finding of a limited fund is necessary, the Court should examine the situation as being a limited fund in respect to TPLC, thus satisfying 23(b)(1)(B), and then evaluate the fairness, reasonableness, and adequacy of the settlement under the standards of Rule 23(e) with regards to the Australian Defendants.

■■ Acknowledging that Rule 23 is to be interpreted according to its plain meaning, *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 123, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989), we agree with Professor Miller's assertion that the specific language of 23(b)(1)(B) does not necessarily require that there be an absolute limited fund situation. Moreover, the language of 23(b)(1)(B) specifies that it is appropriate to maintain a class action under its umbrella if the prerequisites of subdivision (a) are met and the prosecution of separate actions by individual members of the class would create a *risk* that other members not parties to the adjudications would, *as a practical matter, have their interests disposed of or their ability to protect those interest would be substantially impaired or impeded.* Fed. R.Civ.P. 23(b)(1)(B) (emphasis added). In *In re Bendectin Products Liability Litig.*, 749 F.2d 300 (6th Cir.1984), the Sixth Circuit concluded that a limited fund is a justification for a class action under 23(b)(1)(B). *Id.* at 306. Generally, a class action certified

under Rule 23(b)(1)(B) is referred to as a "limited fund" class action because the action "is grounded in the equitable theory that when there is only a limited fund available to satisfy the plaintiffs' claims and when the individuals who sue first could deplete the fund, subsequent plaintiffs would be left without a remedy." *In re Orthopedic Bone Screw Products Liability Litig. v. Acromed Corp.*, 176 F.R.D. 158, 176 (E.D.Pa.1997) (citing Advisory Committee Note to Rule 23, 39 F.R.D. 69, 101 (1966)); *In re Northern District of California "Dalkon Shield" IUD Products Liability Litig.*, 526 F.Supp. 887, 896 (N.D.Cal.1981) ("*Dalkon Shield Litig.*"). The plaintiffs seeking the "limited fund" class certification must present "substantive evidence" showing that the defendant's assets would be insufficient to meet the plaintiffs' claims. *Id.* (citing *In re School Asbestos Litig.*, 789 F.2d 996, 999 (3d Cir.1986)). We note, however, that the evidence need not show that the claims against the defendant "'will,' as a certainty," exhaust the fund. *Dalkon Shield Litig.*, 526 F.Supp. at 897. Thus, we believe that the focus of whether an action constitutes a limited fund for the purposes of settlement should also be toward, as the language of the Rule suggests, the risk of disposing of or substantially impairing the interests of other members of the Class by allowing class members to proceed with individual suits. Accordingly, the test is only whether there is a substantial probability, which is less than a preponderance, but more than a mere possibility, that if damages were awarded the claims of earlier litigants would exhaust the defendant's assets. *In re Granada Partnership Sec. Litig.*, 803 F.Supp. 1236, 1244 (S.D.Tex.1992); *In re First Commodity Corp. of Boston Customer Accounts Litig.*, 119 F.R.D. 301, 312 (D.Mass.1987); *In re Jackson Lockdown/MCO Cases*, 107 F.R.D. 703, 713 (E.D.Mich.1985); *In re "Agent Orange" Prod. Liability Litig.*, 100 F.R.D. 718, 726 (E.D.N.Y.1983).

We recognize that there may be cases with unique circumstances in which there is a need to certify a class as a 23(b)(1)(B) non-opt out class because of the substantial risks that the limited funds available may be depleted through individual suits. *See In re*

*Rio Hair Naturalizer Products Liability Litig., supra.* In other words, we believe that certification under 23(b)(1)(B) may be appropriate if there is a substantial risk to the other parties not before the court that their interests or claims will be impaired or impeded by allowing individual claims to proceed against the defendant, not that there necessarily would be a limited fund in the technical sense.

Certainly, the risk that available funds intended to be used to settle all claims could be exhausted constitutes a threat of substantial impairment under Rule 23(b)(1)(B). Likewise, the loss of a settlement can constitute a risk within the meaning of Rule 23(b)(1)(B). *In re Bone Screw Products Litig.,* 176 F.R.D. at 177. Accordingly, we believe that the risk inherent in this case sufficiently satisfies the risk necessary under the language of 23(b)(1)(b) to appropriately certify the Class as a mandatory non-opt out class.

Nevertheless, a number of objectors argue that the Court should not certify a class under Rule 23(b)(1)(B) because the PSC failed to show that a limited fund exists in regards to PDL and Nucleus. We find this objection unpersuasive for a number of reasons. First, as we stated above, the language of 23(b)(1)(B) does not indicate that it is restricted to only limited fund cases in the most literal sense. To the contrary, it indicates that 23(b)(1)(B) may be applied in cases where there is a substantial risk that the available settlement funds may be exhausted, thereby fatally impairing the ability of the other individual plaintiffs to recover anything.[15]

Secondly, the findings of the summary jury cannot be overlooked to allow individual claimants to maintain separate lawsuits in hopes of achieving verdicts against TPLC, Nucleus and PDL. Moreover, turning such a blind's eye to the summary jury's advisory conclusions to allow individual suits to proceed against PDL and Nucleus would create a substantial risk to the overall interests of the class. At the summary jury trial, the jury found TPLC liable under the theories of strict liability, negligence, and negligence *per se.* However, the jury exonerated the Australian Defendants PDL and Nucleus on the theories of agency and alter ego. Nevertheless, after settlement discussions and examining the costs of litigating each individual action, PDL agreed to participate in the overall settlement by contributing $10,000,000.00 to the Patient Benefit Fund in consideration for a release from all claims. *See* Agreement of Compromise and Settlement ¶¶ 6.1.1 and 7.3. It is quite clear that TPLC would not settle this litigation unless there was closure brought to this matter with regard to all of the Defendants. The inherent risk involved here is that, without the inclusion of the Australian Defendants in the settlement and a release of the claims against them, there may very well be a loss of the settlement fund. If there is no settlement, there will basically be a race to the courthouse by the individual claimants, and this is, in essence, what 23(b)(1)(B) seeks to prevent through equitable distribution. *See Coburn v. 4–R Corp.,* 77 F.R.D. 43, 45 (E.D.Ky.1977) (concluding without determining with exactitude whether each of the defendants could or could not satisfy judgments, if obtained against them, that class certification was appropriate under both 23(b)(1)(A) and 23(b)(1)(B) due to the risks surrounding the case and the necessity of preventing the litigation from becoming a race to the courthouse). "In no event, however, should this litigation become an unseemly race to the courtroom door with monetary prizes for a few winners and worthless judgments for the rest." *Dalkon Shield Litig.,* 526 F.Supp. at 897 (citing *Coburn, supra* ). Rule 23(b)(1)(B) serves as the most practical method to avoid such a phenomenon. *Id.*

Furthermore, even if individual actions against TPLC were successful, we believe that the maintenance and enforcement of actions against Nucleus Limited and PDL may be difficult, if not impossible. First, the summary jury trial made evident that even

---

15. We also note that the objectors provided no authority that shows a settlement under 23(b)(1)(B) may occur only in limited fund cases. To the contrary, one case concluded that a "[m]andatory non-opt out class under Rule 23(b)(1) may also be certified in cases involving claims for money damages in which no 'limited fund' exists." *See White v. National Football League,* 822 F.Supp. 1389, 1411 (D.Minn.1993) (citations omitted).

though TPLC faces significant liability in litigating individual cases against it on the theories of strict liability, negligence, and negligence *per se,* the Australian Defendants apparently do not face the same risks on the theories of agency and alter ego. Although we believe that it would be inappropriate to prejudge the issues surrounding this case, this Court continues to believe, as we indicated in our April 2, 1997 Order Granting In Part Plaintiffs' Renewed Motion for Class Certification, that even though Plaintiffs also sued PDL and Nucleus as TPLC's parent companies, "there is a substantial question whether Pacific Dunlop or Nucleus can be held liable for the activities of their subsidiary, TPLC." *In re Telectronics Pacing Systems, Inc.,* 172 F.R.D. 271, 286 n. 10 (S.D.Ohio 1997). At the summary jury trial, the evidence supporting the exercise of personal jurisdiction over the Australian Defendants was extremely equivocal. Consequently, we believe that there would be a serious question of whether the Court had jurisdiction over them at trial. We note other courts have already held that they did not have personal jurisdiction over the Australian Defendants for the purposes of this litigation. *See Nolen v. TPLC, Inc.,* No. CV–96–216, slip op. at 3–4 (Circuit Court Taladega County, Ala. Jan. 10, 1997) (dismissing PDL based on lack of personal jurisdiction); *see also Poe v. TPLC, Inc.,* CV 96–224, slip op. at 2–4 (Circuit Court St. Claire County, Ala. Aug. 8, 1997) (same).

Coupled with the question of jurisdiction is the fact that TPLC's assets will continuously be depleted as each of the individual cases proceeds in its separate litigation. As Dr. Rosen testified at the hearing, there is a significant risk that the funds will be depleted to the point of exhaustion, and, thus to the detriment of a majority of the other class members. In *In re Rio Hair Naturalizer Prod. Liability Litig., supra,* our sister court faced a dilemma similar to the one before this Court. In *Rio Hair Naturalizer,* the court recognized that, even though the settlement figure of $4.5 million is much less than the defendants' insurance policies' limits of $6 million, the evidence presented by the Plaintiffs' Steering Committee showed that the settlement was necessary to prevent further depletion of the funds available by individual settlements. *In re Rio Hair Naturalizer Products Litig.,* 1996 WL 780512, at *9 n. 11. The court also recognized that the reasonableness of finding a limited fund lay in the acknowledgment of the risk of the insurance carriers' success in a declaratory relief action to disclaim coverage, thus, leaving no funds to be distributed to the overall class. *Id.* Although there is no dispute of insurance coverage in the instant matter, we conclude that there is a serious question of whether the Court could exercise personal jurisdiction over PDL and Nucleus. Furthermore, as we stated earlier, the summary jury findings reemphasized that, even if the jurisdictional issue was favorable for the class, PDL and Nucleus stood a good chance of success on the claims of liability under the theories of alter ego and agency. Nonetheless, while the actions were pending to determine the question of jurisdiction over PDL and Nucleus, the available assets of TPLC would also be depleting in this case.

Third, the time and costs to the individual class members in litigating their actions against the Australian Defendants in Australia may be significant, if not unfeasible altogether. We cannot overlook the fact that the average age of the class is 78. Coupling this fact with the extensive time that may be required to litigate each case only increases the likelihood that a large number of class members would not see and enjoy any award even if successful. Additionally, the out-of-pocket costs for some class members will be tremendous. Apparently, the PSC conducted over seventy-five (75) discovery and evidence depositions throughout the United States and Australia and were required to analyze hundreds of thousands of documents received through discovery, just to bring this matter through a five day summary jury trial.

A final albatross that lingers over the head of this litigation is the issue of bankruptcy. If TPLC instituted an action in bankruptcy to protect itself from all of the individual claimants, this litigation would face needless delays to the detriment of a class whose average age is 78.

Based on the foregoing, the Court holds that there is a convincing and substantial

probability that separate actions, presently in place and otherwise, by individual class members would, as a practical matter, jeopardize the interests of other class members and substantially impede or impair other members from receiving payment for their injuries. Accordingly, we believe that the Class can be appropriately certified as a mandatory non-opt out class under 23(b)(1)(B).

### D. Fairness Issues of Federal Rule 23(e)

Rule 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court...." Fed. R.Civ.P. 23(e). Although Rule 23(e) is silent as to the standard courts should apply to approve or disapprove a proposed settlement, *Parker v. Anderson*, 667 F.2d 1204, 1208 (5th Cir.1982), the standard developed by the courts is to determine whether the proposed settlement is fair, adequate, and reasonable under the circumstances, and whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued. *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir.1990); *In re Rio Hair Naturalizer Prod. Litig.*, No. MDL 1055, 1996 WL 780512, at *11 (E.D.Mich. Dec. 20, 1996) (citing Manual for Complex Litigation, § 30.42 (3d ed.1995)). The court cannot modify the proposed settlement, but must approve or disapprove the proposed settlement "as a whole" in relation to all of those concerned. *See Evans v. Jeff D.*, 475 U.S. 717, 727, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986); *Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956, 965 (3d Cir.1983); *In re Rio Hair Naturalizer Prod. Litig.*, *supra*, at *11 ("The touchstone for final approval is the effect on the class as a whole in light of the particular circumstances....").

Being a preferred means of dispute resolution, there is a strong presumption by courts in favor of settlement. *In re Southern Ohio Correctional Facility*, 173 F.R.D. 205, 211 (S.D.Ohio 1997); *see also In re Rio Hair Naturalizer Prod. Litig.*, *supra*, at *11; *Parker*, 667 F.2d at 1209; *Manual for Complex Litigation*, § 30.42 (3d ed.1995). Consequently, those objecting to the proposed settlement have a heavy burden of proving the unreasonableness of the settlement. *In re Southern Ohio Correctional Facility*, 173 F.R.D. at 211.

When determining whether the proposed settlement is fair, adequate, and reasonable, the court takes into account several factors:

(1) the plaintiff's likelihood of ultimate success on the merits balanced against the amount and form of relief offered in settlement;

(2) the complexity, expense and likely duration of the litigation;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the judgment of experienced trial counsel;

(5) the nature of the negotiations;

(6) the objections raised by the class members; and,

(7) the public interest.

*Id.* at 212. Examining each of these factors, we believe that the settlement is fair, adequate, and reasonable in regards to the interests of the Class as a whole.

### 1. *The plaintiffs' likelihood of ultimate success on the merits balanced against the amount and form of relief offered in settlement*

The summary jury trial served as a strong indication of Plaintiffs' ultimate success if this case would proceed to trial. While the summary jury found liability against TPLC on the bases of strict liability, negligence, or negligence *per se*, it did not find PDL and Nucleus liable on the grounds of alter ego and agency. Nevertheless, the Parties have drafted a settlement where TPLC is contributing the company's remaining assets and PDL agreed to contribute $10 million in return for a release from further litigation. Furthermore, the PSC has entered into an agreement with HCFA for the release of all past, present, and future claims by the United States for expenses related to medical treatment made necessary by the "J" Leads. Finally, the settlement ensures that members of the Class can receive continued medical monitoring, namely fluoroscopies. Therefore, when balanced against one another, we believe that Plaintiffs' likelihood of ultimate

success on the merits is outweighed by the form and relief the PSC has made available through its negotiations. Continuing this litigation will only delay benefits to the Class while further depleting the remaining assets of TPLC. In light of the unique circumstances of this case and the findings of the summary jury, we believe that the benefits to the class far outweigh the chances of ultimate success on the merits, and thus this factor demonstrates that the settlement is fair, adequate, and reasonable.

### 2. The complexity, expense and likely duration of the litigation

The factual and legal issues of this case are complex. Although the Parties have been working diligently to resolve this matter, the case has been pending for over four (4) years. Even though this Court proceeded through a summary jury trial, the complexity of the case lies in the issue of whether the court could exercise personal jurisdiction over the Australian Defendants. The resolution of this issue alone could create extensive appeals. The average age of the Class is 78. Their injuries from the defective "J" Lead are diverse: some have died, some have faced major complications, some have had minor complications, and others have experienced no complications at all. The longer this matter continues is detrimental to the overall class whereby some persons may not receive any award in their lifetimes.

### 3. Stage of the proceedings and the amount of discovery completed

At the time of the settlement, the Parties had completed discovery and taken the case through a summary jury trial. The summary jury trial made the Parties aware of the strengths and weaknesses of their respective positions. Apparently, the Parties reached a settlement after a thorough investigation and analysis of the facts and legal issues implicated in this case.

### 4. The judgment of experienced trial counsel

On July 14, 1995, the Court appointed Class Counsel. The group of litigators comprising of the Class Counsel include Attorney Stanley M. Chesley, of the law firm Waite, Schneider, Bayless & Chesley Co.; Daniel E. Becnel, Jr., of the law firm Becnel, Landry & Becnel; R. Eric Kennedy, of the law firm Weisman, Goldberg & Weisman Co.; Thomas D. Rogers, of the law firm Ness Motley Loadholt Richardson & Poole; Roger P. Brosnahan, of the law firm Brosnahan, Joseph, Lockhart & Suggs; Jack Baldwin, of the law firm Baldwin and Baldwin; Arthur Sherman, of the law firm Sherman Salkow Petoyan & Weber; Calvin Fayard, Esq.; Richard S. Wayne, of the law firm Strauss & Troy; Ron Parry, of the law firm Arnzen Parry & Wentz; David J. Guin, of the law firm Donaldson, Guin & Slate; Elizabeth Cabraser, of the law firm Lieff, Cabraser, Heimann & Berstein; David J. Bershad, of the law firm Milberg Weiss Bershad Hynes & Lerach; Charles Zimmerman, of the law firm Zimmerman Reed; Martis Ann Brachtl, of the law firm Goodkind Labaton Rudoff; Louis F. Gilligan, of the law firm Keating Muething & Klekamp; and, Arnold Levin, of the law firm Levin Fishbein Sedran & Berman.

We find that these attorneys, serving with others as Class Counsel, are extremely qualified and experienced in medical class action litigation. Certainly, Class Counsel's recommendation to approve the settlement is well-informed. The Court heeds the recommendation of such experienced counsel.

### 5. The nature of the negotiations

The Court should always give significant weight to the belief of experienced counsel that the settlement is in the best interest of the class. *In re Bone Screw Products Liability Litig.*, 176 F.R.D. at 184 (citing *Austin v. Pennsylvania Dep't of Corrections*, 876 F.Supp. 1437, 1472 (E.D.Pa.1995)). Initially, however, the Court should determine whether the settlement was not collusive and reached through arms-length negotiations. *Id.* Having presided over this litigation and the summary jury trial, we conclude that the settlement was reached as a result of hard-fought and intense arms-length negotiations. The negotiations did not reflect or suggest any collusion or illegality.

### 6. Objections raised by the class members

Of approximately 17,000 class members, only 53 filed written objections to the settle-

ment and only a handful of that number appeared at the Fairness Hearing to express their objections. Generally, a diminutive amount of objectors may signify that a settlement is fair. *See Newberg on Class Actions,* § 11.48 (3d ed.1992). Furthermore, the fact that some class members object to the settlement does not by itself prevent the court from approving the settlement. *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240, 246 (S.D.Ohio 1991).

We have carefully reviewed all of the objections below, as well as the settlement in its entirety. We conclude that the settlement is fair, adequate, and reasonable.

The objections fall into 7 basic categories: (a) objections regarding whether the settlement takes into account the circumstances of each individual class member; (b) objections that class members are foreclosed from recovering additional amounts under the settlement once they accept payment under a given class category; (c) objections regarding the monetary amount of recovery the class members will receive; (d) objections that class certification as a non-opt out class violates due process; (e) objection that the settlement cannot constitute a "limited fund" for the purposes of 23(b)(1)(B) by including PDL and Nucleus, *discussed in Section C of this Order, supra;* (f) objections to the settlement should not include a release of PDL, Nucleus, or Cordis; and, (g) objections that the settlement guarantee that all class members will receive funds.

### a. *Individual circumstances of class members*

A number of objections contend that the proposed settlement fails to take into consideration the individual circumstances of each class member. Specifically, the objectors assert that some class members have problems exclusive to their overall situation and consideration of them in the aggregate is not appropriate.

At the Fairness Hearing, the Court was particularly concerned with the discretion provided to the Settlement Master in the Settlement Agreement to address special circumstances of the members of the Class. Contrary to the objectors' assertions, we find that the settlement provides the Settlement Master with significant latitude to address special circumstances that may arise between class members. In the "Second Submission of Amended Summary Plan of Allocation," filed on December 10, 1998, one provision expressly states:

> The Plaintiffs' Steering Committee has made its best efforts to allocate the monies in the Patient Benefit Fund to the Qualified Settlement Class Members. Such allocation is based on the Plaintiffs' Steering Committee's Analysis of the monies necessary to satisfy payments to Qualified Settlement Class Members. *If the Master determines that an adjustment is necessary in the allocation of the monies in the Patient Benefit Fund (i.e., that there are additional funds available for distribution), the Master, in consultation with the Plaintiffs' Steering Committee and with the approval of the Court, may alter the plan of allocation contained in this Agreement to increase or decrease the total payments to be received by Qualified Settlement Class Members.*

*See* doc. 654 at 10 (Section (I) (emphasis added)). Furthermore, the discretion of the Settlement Master is reaffirmed in Section (y), which states that:

> The Master shall have the discretion to apply to the Court for an increase in payments to be made to the Qualified Settlement Class Members under Categories 1–5.

*See* doc. 654 at 15 (Section (y)).

We conclude that the settlement does allow the Settlement Master to account for and address special problems that may arise between Class Members in Categories 1 through 5. In light of the fact that the settlement does provide such discretion to the Settlement Master, we do not think that this objection is a basis for rejecting the agreement.

### b. *Objections that settlement forecloses members to later remedies*

Some class members object to the settlement on the grounds that, if class members accept payments within one category, they are foreclosed from recovering at a later time in another category if their conditions

change. This contention is misplaced. The Settlement Agreement specifically accounts for these situations, providing in Section (r) that:

> If a Qualified Settlement Class Member, or spouse, has received compensation as a Qualified Settlement Class Member in another category pursuant to this Agreement, the additional compensation paid to the Qualified Settlement Class Member, or his or her estate, shall be reduced by any amounts previously paid to the Qualified Settlement Class Member, or spouse, for his or her claims under any other category of this Agreement.

*Id.* at 13 (Section(r)). There is no foreclosure problem as the objectors suggests. Therefore, we conclude that there is no need to reject the settlement on this ground.

### c. *Amount of recovery objections*

Some objectors argue that the amounts awarded under each classification are inadequate. However, we find that the amounts awarded are fair and adequate in light of the monetary relief available as well as the substantial possibility that individual plaintiffs could be awarded a considerably lower sum at trial. As Dr. Rosen testified, if only a small amount of individual cases proceeded against TPLC, those cases would deplete the remaining assets of the company in litigation costs alone. If judgments were reached only a small number of cases would be satisfied. Thus, the creation of a race to the courthouse would occur where individual plaintiffs would seek relief to the detriment of the interests of the class as a whole.

A few objectors suggest that the amount awarded under the settlement does not sufficiently punish TPLC for its wrongdoing in this case. However, TPLC is relinquishing all of its remaining assets to the settlement fund. Although some objectors assert that the Category I award of $500 is an insult to the class, we note that these members and their spouses are to receive monies without any show of damages. Such a claim may be difficult to bring in an individual suit.[16] Nev-

ertheless, the settlement accounts for those individuals and enables them to participate in the medical monitoring program as well.

In light of the evidence presented by Dr. Rosen regarding TPLC's financial assets and the summary jury trial findings validating the low level of liability PDL and Nucleus would face in individual cases, we believe that the settlement fairly and adequately compensates Class Members. Thus, we will not reject the settlement on this ground.

### d. *Due process objections*

Some objectors assert that certifying the class as a non-opt-out class violates due process. Moreover, they contend that binding all class members to the settlement agreement under a 23(b)(1)(B) class is a violation of the Rule. We disagree with both of these contentions. First, as we stated previously in Section C of this Order, the language of Rule 23(b)(1)(B) does not expressly preclude certification of a class as a non-opt out class unless there is a "limited fund." Secondly, we agree with Professor Miller's view that this case could be seen as a "limited fund" case in regards to TPLC's finite assets and adjudged in accordance to the fairness and reasonableness of the settlement in regards to PDL and Nucleus. In light of our review of the arguments of counsel, the evidence, as well as the findings of the summary jury, we conclude that such an analysis would also be appropriate. Thus, in considering the settlement in this fashion as well as looking to the best interests to the class "as a whole," we believe that the Class should be certified as a non-opt out class under Rule 23(b)(1)(B). *See In re Orthopedic Bone Screw Products Liability Litig.,* 176 F.R.D. at 181 (holding that the certification of a mandatory, non-opt out class under 23(b)(1)(B) does not violate due process).

### e. *Objections that settlement releases PDL, Nucleus, and Cordis.*

Some objectors assert that even if the settlement is accepted, PDL, Nucleus and

---

16. Note, *Bowling v. Pfizer,* 922 F.Supp. 1261, 1263 (S.D.Ohio 1996) (acknowledging that in a significant number of courts where suits were brought on behalf of heart valve plaintiffs whose valves had not actually fractured, defendants were able to get those courts to dismiss the suits on the ground that there is no right to recover for emotional distress arising from a valve implantee's fear that a properly functioning valve might fracture in the future).

Cordis should not be released under its terms. We disagree with this objection. Although Plaintiffs established the possibility at the summary jury trial that their claims of liability against TPLC on the theories of strict liability, negligence and negligence *per se* would prevail, the summary jury validated earlier warnings that PDL and Nucleus would not be liable to Plaintiffs on the grounds of alter ego and agency. There is also a problem of personal jurisdiction by the court over PDL and Nucleus. Nevertheless, subsequent to the summary jury trial, PDL agreed to contribute $10 million to the settlement to avoid what it believes is needless litigation. Providing all of its remaining assets to the settlement, TPLC asserts that it will not settle without the release of PDL, Nucleus or any Defendant–Related Party, i.e., Cordis.

The Court believes that it is not unreasonable for TPLC to seek a release of PDL and Nucleus under the settlement based on the findings of the summary jury. In addition, the Court concludes that a release of Cordis is proper if the settlement is to have a meaningful impact. We note that, even though Cordis did not participate in the summary jury trial, TPLC proffers the affidavit of Larry A. Wettlauer, President of Accufix Research Institute, Inc., who avers that the release of Cordis as a Defendant–Related Party is necessary to the settlement because Cordis and TPLC entered into an agreement in 1996 whereby Cordis paid TPLC $6 million in exchange for indemnity from TPLC for cases arising out of the "J" Leads. (*See* doc. 605: Ex. A Wettlauer Aff. at ¶ 13). "Any recovery against Cordis for a Leads–Related Claim would, therefore, be the responsibility of [TPLC]." (*Id.*) Thus, we believe that for the settlement to be effective, without any delays of TPLC being drawn into collateral litigation via suits against Cordis, a release of Cordis is also appropriate under the agreement.

#### f. *Objections that the settlement does not guarantee that all class members will receive funds.*

Some objectors suggest that the settlement does not guarantee that all class members will receive just compensation under its terms. This contention is without merit.

Under the terms of the settlement agreement, class members are placed in categories ranging from 1 through 5. Each class member, based on the specific circumstances delineated within his or her specific category, will receive some form of monetary relief with some being able to participate in the medical monitoring program. Furthermore, if the class members' medical condition changes, they may still be compensated according to the next appropriate subclass with a reduction of their previous award.

### 7. *The Public Interest*

Finally, the public interest is served by the resolution of this matter. This is a complex class action case which, as complex mass tort litigation typically does, has placed a significant strain through its protracted and costly proceedings on the Court and its docket. The resolution of this case will end the hard-fought battle between these parties that is only serving to deplete the assets of one of the primary defendants. The public has an interest in seeing individuals recovering something for their compensable injuries, not protracting litigation until one of the primary defendants has depleted its resources to the point of exhaustion. The settlement recognizes the mature age of the class and seeks to provide them with immediate compensation for their injuries as well as continued medical monitoring. The settlement also seeks to insure that everyone is compensated by providing a "holdback" provision. Certainly, the immediate compensation and medical monitoring of the class members will remove potential burdens on the overall health system and the public at-large. Thus, the Court finds that the public interest is significantly served by the settlement.

The implantation of the "J" Leads into the Class Members signified new hope at fulfilling a longer lasting life. Having discovered that the instrumentality placed within their bodies were defective, class members and their families have engaged in this litigation for more than four years. The average age of the class is 78 and time is of the essence. The settlement as drafted would insure that class members receive immediate benefits for their injuries as well as continue to have

expenses related to fluoroscopic examinations paid. Nothing in the settlement prevents a class members from seeking adjustments in their remedies if their situations become worse on account of defective Leads. In fact, the settlement specifically provides the Settlement Master with discretion to address special problems. Additionally, the settlement provides a "holdback" provision to insure that it serves a greater good for the greatest number of class members including "future claimants." Based upon the foregoing, we find the settlement is fair, adequate, and reasonable in light of the circumstances of this case, and we APPROVE the settlement.

Accordingly, we hereby GRANT the Plaintiffs' Steering Committee's Motion to Approve the Class Action Settlement and Mandatory Class Certification.

### E. Class Counsel's Joint Application For An Award Of Attorneys' Fees and Reimbursement Of Expenses

Class Counsel also seeks attorneys' fees in this case and reimbursement for costs and expenses. Specifically, Class Counsel moves for an award of attorneys' fees totaling twenty-eight (28%) percent of the Patient Benefit Fund and Reserve Fund, or a total of $17,157,083.16, plus their out-of-pocket expenses which total $2,243,771.93. Class Counsel also seeks $441,991.79 to reimburse the individual private contingency attorneys for their out-of-pocket expenses. Finally, Class Counsel requests special payments in the amount of $141,000.00 to be paid to a number of individual plaintiffs that assisted in the prosecution of this litigation.[17]

Defendants do not to oppose Class Counsel's Application for attorneys' fees and reimbursement of expenses. Furthermore, Defendants made no challenge to Class Counsel's request for special payments to be made to certain individual plaintiffs.

### 1. PSC's Out-of-Pocket Expense

In their application, the PSC requests that this Court award a reimbursement of their out-of-pocket expenses in the amount of $2,243,771.93. However, one objector asserts that the expenses charged by the PSC should be reduced by the Court for the PSC's failure to account for the lack of proper documentation and duplication of services. Having reviewed the materials submitted in the record, we find this objection unpersuasive, and thus, we will not reduce the amount the PSC seeks in reimbursement of its out-of-pocket expenses. Accordingly, we conclude that the PSC is entitled to receive reimbursement for its out-of-pocket expenses in the amount of $2,243,771.93, to be paid immediately.

### 2. Private Contingency Attorneys' Out-of-Pocket Expenses

The PSC also recommends that the private individual counsel in this case be awarded $441,991.79 for the reimbursement of their out-of-pocket expenses.

 This is a case where a common fund has been created through the efforts of counsel. Historically, the rationale entitling counsel to a percentage of the common fund derives from the equitable power of the courts under the doctrines of quantum meruit, *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 124, 5 S.Ct. 387, 28 L.Ed. 915 (1885); unjust enrichment, *see, e.g., Trustees v. Greenough*, 105 U.S. (15 Otto) 527, 532–33, 26 L.Ed. 1157 (1881); and later, what has become known as the "substantial" or "common benefit" doctrine. *See Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 392–93, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). All of these doctrines fall under the larger umbrella of the "common fund" doctrine. Under the common fund doctrine, fee reimbursement is permitted in the following circumstances: (1) when litigation indirectly confers substantial monetary or nonmonetary benefits on mem-

---

17. During the Hearing on Attorneys' Fees, Attorney Richard Wayne averred that the PSC believes that a request for incentive payments should be made to a number of individual plaintiffs for providing additional assistance to the PSC (doc. 640). Specifically, Mr. Wayne stated

that the individual plaintiffs assisted in filling out questionnaires, attending the summary jury trial, and attending various hearings on behalf of the class. (*Id.*) Furthermore, some of the individual plaintiffs were even deposed twice. (*Id.*).

bers of an ascertainable class, and (2) when the court's jurisdiction over the subject matter of the suit, and over a named defendant who is a collective representative of the class, makes possible an award that will operate to spread the costs proportionately among class members. H. Newberg, *Attorney Fee Awards*, § 2.01, at 28–29 (1986).

 It is undisputed that the efforts of the private contingency counsel in the state cases placed a significant amount of pressure on the Defendants to settle this class action. For that reason, we believe that such counsel contributed to the creation of the settlement fund, and accordingly, are entitled to receive a reimbursement of their out-of-pocket expenses in the amount of $441,991.79. *See e.g., Skelton v. General Motors Corp.*, 860 F.2d 250, 253 (7th Cir.1988) (recognizing that attorneys in a class action in which a common fund is created are entitled to compensation for their services and reimbursement of their out-of-pocket expenses, but the amount is subject to court approval); *Union Central Life Ins. Co. v. Hamilton*, 493 F.2d 76, 79 (7th Cir.1974); H. Newberg, *Attorney Fee Awards* § 2.19, at 69 (1986). The private contingency attorneys' reimbursement amounts are to be paid immediately.

### 3. Special Award to Particular Plaintiffs

There is no dispute that a number of the individual plaintiffs provided significant assistance to the PSC, and the PSC requests an incentive award to be made to those individuals. Finding that their assistance has benefitted the Class overall in this case, we hereby ORDER that $141,000.00 be paid to a number of individual plaintiffs that assisted in the prosecution of this litigation in the amounts recommended by the PSC at pages 4 and 5, *supra.*

### 4. Attorneys' Fees and Expenses

Finally, the PSC seeks an award of attorneys' fees totaling twenty-eight (28%) percent of the Patient Benefit Fund and Reserve Fund, or a total of $17,157,083.16. The PSC submitted a number of affidavits from its members detailing the work the PSC performed in litigating this case, including the number of hours expended by each member of each law firm and the attorney's respective hourly rate. The affidavits submitted show that the PSC and the other attorneys who provided the Committee assistance expended 72,323.14 hours in this case to date, equating to a lodestar amount of $16,051,165.35 in fees. Although the lodestar amount is approximately $16,000,000, the PSC seeks an award in attorneys' fees in the amount of 28% of the Patient Benefit Fund and Reserve Fund, which amounts to $17,157,083.16. We recognize that the figure requested by the PSC is $1,105,917.81 more than the lodestar.

 As stated earlier, this is a case where a common fund has been created through the efforts of counsel, and under the principles of the "common fund doctrine," "a litigant or lawyer who recovers a common fund for himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole." *In re Southern Correctional Facility*, 173 F.R.D. at 216 (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980)); *see also Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). However, award of attorneys' fees lies within the sound discretion of the district court. *Smillie v. Park Chemical Co.*, 710 F.2d 271, 275 (6th Cir.1983) (citing *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974)). The ultimate task for the district court is to insure that counsel is fairly compensated for the amount of work performed and the results achieved. *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir.1993) (citation omitted). Moreover, the district court must determine the reasonableness of the fee request in light of the particular circumstances of the litigation. *Id.* at 516; *Smillie*, 710 F.2d at 275.

 The Sixth Circuit currently accepts two methods of determining the reasonableness of a fee request. The first method—the "lodestar" method—requires the class counsel to submit a listing of hours and their rates charged per hour. The lodestar method necessitates that the court calculate the number of hours submitted multiplied by the attorneys' hourly rates. This sum is then generally increased by a "multiplier" to account for the costs and risks involved in the litigation, as well as the complexities of the

case and the size of the recovery. *See New-berg on Class Actions* § 12.55 (3d ed.1992). The application of the lodestar method is advantageous because it provides greater accountability for the amount of work performed by class counsel. *Rawlings*, 9 F.3d at 516. Furthermore, the "lodestar" method may be used to account for the risk undertaken by class counsel in assuming the litigation, the quality of the work performed, and the public benefit achieved. *Id.* In practice, however, the lodestar method creates substantial problems because it is "time-consuming to administer, inconsistent in result, and capable of manipulation to reach a predetermined result." *Manual on Complex Litigation,* § 24.121, at 189 (3d ed.1995).

■ The other method that is accepted in this Circuit is the "percentage of the fund" method which stands in stark contradistinction to the lodestar approach. Under the percentage of the fund method, the court simply determines a percentage of the settlement to award the class counsel. *Manual on Complex Litigation,* § 24.121, at 187–90 (3d ed.1995). The percentage of the fund method is more advantageous than the lodestar method because it more accurately reflects the results achieved in light of the unique circumstances of any particular case, without the court becoming entangled in a time-consuming process of toiling over time sheets and considering some unnecessary factors. *Rawlings*, 9 F.3d at 516.[18] Contrary to the lodestar method, the percentage of the fund method is easier to calculate, establishes reasonable expectations on the part of plaintiffs' attorneys as to their expected recovery, and encourages early settlement instead of prolonged litigation. In essence, the percentage of the fund method avoids needless review of the costs of litigation, while reflecting on the reasonable expectations of class counsel as to the result.[19] Accordingly, if the actual settlement amount is lower than expected, the percentage amount awarded in attorneys' fees will provide a reduced return. Logically, it follows that if the award is as expected or higher, the percentage of the fund method would yield a higher return. The overall goal of the percentage of the fund method in light of these consequences is to "apportion the funds between the class and its counsel in a manner that rewards counsel for success and penalizes it for failure." *In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litig.,* 55 F.3d 768, 821 (3d Cir.1995).

■ Although the choice between either method of calculation is a matter left to the discretion of the district court upon consideration of the individual case's unique circumstances, the preferred method in common fund cases has been to award a reasonable percentage of the fund to Class Counsel as attorneys' fees. *In re Southern Correctional Facility,* 173 F.R.D. at 217; *Bowling v. Pfizer, Inc.,* 922 F.Supp. 1261, 1278–79 (S.D.Ohio 1996). Accordingly, we believe that, in light of the unique circumstances of this case, the percentage of the fund method is a more suitable approach in calculating reasonable attorneys' fees. We agree that the use of lodestar method will only burden the Court with the cumbersome task of ferreting through time sheets only to run the risk of still achieving an artificial result.

■ The district court also has discretion to determine the percentage amount to

---

18. While not rejecting its application, the Sixth Circuit criticized the "lodestar" method as "being too time-consuming of scarce judicial resources." *Rawlings*, 9 F.3d at 516. Further, the court stated:

[A] district court must pore over time sheets, arrive at a reasonable hourly rate, and consider numerous factors in deciding whether to award a multiplier. With the emphasis it places on the number of hours expended by counsel rather than the results obtained, it also provides incentives for overbilling and the avoidance of early settlement.

*Id.* at 516–17 (citing *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1268–69 (D.C.Cir.1993) &

*Court Awarded Attorney Fees,* Report of the Third Circuit Task Force, 108 F.R.D. 237, 247–48 (1985)).

19. Although one of the objectors questions the hourly rates of legal counsel for the PSC, we note that we are not approving the hourly rates of such counsel. However, based on our experience dealing with counsel, a review of the hours expended in this case, a review of the briefing, as well as noting the complex issues involved in this litigation, we believe that the hours are certainly reasonable even if some of the hourly rates appear to be unreasonably high.

award in attorneys' fees. *Smillie*, 710 F.2d at 275. Generally, in common fund cases, the fee percentages range from 10 to 30 percent of the common fund created. *See Bowling v. Pfizer*, 922 F.Supp. 1261, 1283 (S.D.Ohio 1996) (awarding 10% of the common fund, plus expenses; commentators); *see also Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir.1989) ("25 percent has been a proper benchmark"); *Weseley v. Spear, Leeds & Kellogg*, 711 F.Supp. 713, 718 (E.D.N.Y.1989) (acknowledging that fees typically range from 15% to 30% of the recovery in the circuit). In *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188 (6th Cir.1974), the Sixth Circuit set forth the factors that the district court must consider in assessing a reasonable award from a common fund: (a) the value of the benefit rendered to the class; (b) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (c) whether the services were undertaken on a contingent fee basis; (d) the value of the services on an hourly basis; (e) the complexity of the litigation; and (f) the professional skill and standing of all counsel. *Id.; see also Smillie*, 710 F.2d at 275; *In re Dun & Bradstreet Credit Serv. Customer Litig.*, 130 F.R.D. 366, 373 (S.D.Ohio 1990).

a) There is a significant benefit to the class by the settlement of this litigation for a reasonable amount. The average age of the class is 78 years old and there is a need for ongoing medical monitoring of some of the class members. Consequently, time is of essence, and protracted litigation creates a risk that many class members may not see the fruits of any judgment in their lifetimes. As we stated earlier, we believe that the overall settlement, to which should be added the value of the HCFA settlement is fair, adequate and reasonable. Contrary to the objections that more monies may be available from the parent corporations, we believe that such conjectures are based on speculations that fail to give value to the findings of the summary jury that validated the inherent risks involved in continuing this litigation. Further, the objectors ignore the inherent risk that any award to the class could be lost due to bankruptcy and/or the total depletion of TPLC's assets in defending itself. Accordingly, we believe that the settlement is

valuable because it insures immediate redress of individuals to whom, because of their average age, time is essential. Further, the settlement insures that those members who need continued treatment, including medical monitoring will have such relief while at the same time be released from their obligations to reimburse HCFA.

b) The "benefit to society" factor is also satisfied in this case. In litigating this case, Class Counsel expended significant resources of both time and monies. Class Counsel employed expert witnesses and conducted extensive discovery, which included reviewing thousands of pages of documents, holding investigations, and deposing numerous individuals. We believe that, without such a class action, small individual claimants would lack the resources to litigate a case of this magnitude. Attorneys who take on class action matters serve a benefit to society and the judicial process by enabling such small claimants to pool their claims and resources. As the *Rio Hair Naturalizer* Court stated, "[t]his is particularly true in limited fund matters where the equitable distribution of funds is of paramount importance." *See Rio Hair Naturalizer Products Liability Litig.*, 1996 WL 780512, at *17 (E.D.Mich. Dec. 20, 1996).

c) In regards to the services being undertaken on a contingency fee basis, we recognize that contingency fee arrangements indicate that there is a certain degree of risk in obtaining a recovery. Class Counsel accepted this litigation on a contingency fee basis, evidencing their recognition of the risk in this case. The risk that Class Counsel assumed entailed working over 72,000 hours and advancing a substantial amount of out-of-pocket expenses.

d) The "value of services" Class Counsel request for their services is approximately $17,157,083.16, which is $1,105,917.81 more than the lodestar of $16,051,165.35, and represents 28% of the gross amount available to the Class.

e) As seen from the history of this case, this litigation is weighted with complexities. The domiciles of class members span the nation. If this litigation proceeded to trial on an individual basis, in order to establish lia-

bility against the Defendants, the separate claimants would have to overcome a number of obstacles, such as establishing the liability of TPLC and than proving the liability of the parent companies through the theories of alter ego and agency. Thus, we find that the fifth factor in the *Ramey* analysis is satisfied.

f) Finally, in examining the sixth factor of the *Ramey* analysis, we find that the professional skill and standing of all counsel involved on behalf of the class was highly commendable. This case represents hard-fought litigation, and, in the beginning, a settlement appeared almost inconceivable. Class Counsel demonstrated their professionalism and skill by, after receiving the findings of the summary jury trial and being made aware of the strengths and weaknesses of their case, constructing a settlement from the remaining assets of TPLC, a contribution from PDL, and entering into an agreement with HCFA for its release of all subrogation claims to past, present, and future payments to class members associated with the cost of explants and fluoroscopies.

Recognizing the extensive amount of time, services, and skill Class Counsel expended in this case, the Court concludes that the reputations of Class Counsel are well earned.

As stated earlier, Class Counsel seeks an award of 28% of the Patient Benefit Fund and Reserve Fund, or a total of $17,157,083.16. A number of objectors contend that the 28% Class Counsel request is excessive in light of the "limited fund" available in this case to the class. Some objectors assert that awarding attorneys' fees as well as the out-of-pocket expenses of the PSC and private contingency attorneys would equate to an award of over 30% of the Patient Benefit Fund and the Reserve Fund. The objectors suggest that the Court award the PSC attorneys' fees in the amount of 13% and reduce the reimbursement of expenses for overbilling and lack of itemization.

■ Having reviewed the six factors set forth by the *Ramey* court, we disagree with the objectors contentions that the fee award should be reduced from 28%. Rather, we conclude that an award of 28% of the *net* Patient Benefit Fund and Reserve Fund is appropriate in this case. Specifically, we find that the PSC's out-of-pocket expenses of $2,243,771.93, the expenses of the private contingency attorneys, which total $441,991.99, and the incentive awards to be provided to certain plaintiffs in the amount of $141,000 should be deducted from the gross aggregate of the Patient Benefit Fund and Reserve Fund. *Compare Lachance v. Harrington*, 965 F.Supp. 630, 647 (E.D.Pa.1997) (awarding class counsel fees of 30% of the net settlement fund, i.e., the gross fund minus reasonable expenses out of the common fund); *with Gilman v. Independence Blue Cross*, No. Civ.A. 96–1601, 1997 WL 633568, at *12 (E.D.Pa. Oct. 6, 1997). Thus, Class Counsel is hereby awarded 28% of the remaining net amount of $58,448,533.08, or a total of $16,365,589.26 in fees. We find that a percentage of the fund award equaling this amount more accurately parallels the lodestar amount of $16,051,165.35. *See In re General Motors Corp.*, 55 F.3d at 821 n. 40 (use of the lodestar method to confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate is appropriate).[20]

### 5. The Holdback Provision

■ Although Class Counsel requested at the January 19th hearing that the total sum, if awarded, be provided to Class Counsel at one time, we disagree in light of the "holdback" provisions precluding some of the class members from receiving their total award in one payment. Accordingly, Class Counsel shall receive 60% of their total attorneys' fees at the time of the initial payments to the Class by the Settlement Master with the remaining portion provided in four subsequent installments annually. Therefore, of the 40% withheld from the initial payment, Class Counsel shall receive 15% in the first installment payment, 12% in the second installment payment, 8% in the third install-

---

**20.** We also note that certain private contingency counsel have separately moved for allowance of fees and expenses. We are not addressing these applications because such counsel are not parties of record. As stated in this opinion, based on the recommendation of the PSC, the reimbursement of out-of-pocket expenses of private contingency counsel who have contributed to the creation of the common fund through their state court efforts shall be approved.

ment payment, and the remaining 5% in the final installment payment. Such installment payments to Class Counsel shall be made at the same time the "holdback" provision payments are paid to the Class Members by the Settlement Master.

### 6. Interest

■ We also note that the Class is not to receive the interest on the amount of their award that is withheld due to the "holdback" provision. In accordance with that principle, we believe that Class Counsel should similarly not receive interest on the amount of attorneys' fees that is withheld from the initial payment. Interest from both the amounts withheld from the Class and the amount withheld in attorneys' fees shall be used by the Special Master to pay administrative costs and expenses.

### IV. CONCLUSION

Having heard the oral arguments of Class Counsel regarding the entire settlement, as well as the objections against the settlement and/or attorneys' fees, we find the settlement fair, adequate, and reasonable in this case. Furthermore, we AWARD that PSC's attorneys 28% of the net Patient Benefit Fund and Reserve Fund. Such attorneys' fees are to be paid by the Settlement Master at the same time annually as the awards are distributed to the Class Annually. Accordingly, we hereby AWARD Class Counsel attorneys' fees in the amount of $16,365,589.26 and AWARD reimbursement of expenses to Class Counsel in the amount of $2,243,771.93. Additionally, we AWARD a reimbursement of expenses to the individual private attorneys in the amount of $441,991.79, to be distributed by the PSC to the individual private attorneys. Finally, we AWARD the plaintiffs identified above, who assisted Class Counsel in this litigation, a total amount of $141,000.00.

SO ORDERED.